**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **TASHONDA TROUPE, individually and on behalf of LAMAR CATCHINGS, deceased,** )<br>)<br>)<br>) | |
| )<br>**Plaintiff,** )<br>) | **Cause No.: 4:20-cv-01790-RWS** |
| **V.** )<br>) | **JURY TRIAL DEMANDED** |
| **SAINT LOUIS COUNTY, MISSOURI,** )<br>) | |
| **Serve at:** )<br>**Lawrence K. Roos Govt. Bldg.** )<br>**41 South Central Avenue, 9th floor** )<br>**Clayton, Missouri 63105,** )<br>) | |
| **and** )<br>) | |
| **JULIA MURPHY, in her individual and official capacities,** )<br>)<br>) | |
| **Serve at:** )<br>**Buzz Westfall Justice Center** )<br>**100 South Central Avenue** )<br>**Clayton, Missouri 63105,** )<br>) | |
| **and** )<br>) | |
| **SPRING SCHMIDT, in her individual and official capacities,** )<br>)<br>) | |
| **Serve at:** )<br>**6121 North Hanley Road** )<br>**Clayton, Missouri 63134** )<br>) | |
| **and** )<br>) | |
| **EMILY DOUCETTE, in her individual and official capacities,** )<br>)<br>) | |
| **Serve at:** )<br>**6121 North Hanley Road** )<br>**St. Louis, Missouri 63134,** )<br>) | |

1

and                                              )
                                                 )
**DEXTER SWIMS, in his individual**             )
**capacity,**                                    )
                                                 )
**Serve at:**                                    )
**Buzz Westfall Justice Center**                )
**100 South Central Avenue**                    )
**St. Louis, Missouri 63105,**                  )
**and**                                          )
                                                 )
**JUSTIN MOHLER, in his individual**            )
**capacity,**                                    )
                                                 )
**Serve at:**                                    )
**Buzz Westfall Justice Center**                )
**100 South Central Avenue**                    )
**Clayton, Missouri 63105**                     )
                                                 )
**and**                                          )
                                                 )
**DANIEL MORGAN , in his individual**           )
**capacity,**                                    )
                                                 )
**Serve at:**                                    )
**Buzz Westfall Justice Center**                )
**100 South Central Avenue**                    )
**Clayton, Missouri 63105,**                    )
                                                 )
**and**                                          )
                                                 )
**FELCIA COLLINS,**                             )
**in her individual capacity,**                 )
                                                 )
**Serve at:**                                    )
**Buzz Westfall Justice Center**                )
**100 South Central Avenue**                    )
**Clayton, Missouri 63105,**                    )
                                                 )
**and**                                          )
                                                 )
**BRYAN KIRKBRIDE, in his individual**          )
**capacity,**                                    )
                                                 )
**Serve at:**                                    )
**Buzz Westfall Justice Center**                )

2

100 South Central Avenue )
Clayton, Missouri 63105, )
)
and )
)
MONIKA WILLIAMS, in her individual )
capacity, )
)
Serve at: )
Buzz Westfall Justice Center )
100 South Central Avenue )
Clayton, Missouri 63105, )
)
and )
)
JUSTIN ANDERSON, in his individual )
capacity, )
)
Serve at: )
Buzz Westfall Justice Center )
100 South Central Avenue )
Clayton, Missouri 63105, )
)
and )
)
JORDAN ATWATER, in his individual )
capacity, )
)
Serve at: )
Buzz Westfall Justice Center )
100 South Central Avenue )
Clayton, Missouri 63105, )
)
and )
)
LAKEISHA WALKER, in her individual )
capacity, )
)
Serve at: )
Buzz Westfall Justice Center )
100 South Central Avenue )
Clayton, Missouri 63105, )
)
)
and, )
)

3

**STEVEN DREWS,**
**in his individual capacity,** )

)

**Serve at:** )
**Buzz Westfall Justice Center** )
**100 South Central Avenue** )
**Clayton, Missouri 63105,** )

)

**and,** )

)

**NATHANIEL BEARD,** )
**in his individual capacity,** )

)

**Serve at:** )
**Buzz Westfall Justice Center** )
**100 South Central Avenue** )
**Clayton, Missouri 63105,** )

)

**and,** )

)

**RODRICK OLIVER,** )
**in his individual capacity,** )

)

**Serve at:** )
**Buzz Westfall Justice Center** )
**100 South Central Avenue** )
**Clayton, Missouri 63105,** )

)

**and,** )

)

**ANTHONY YOUNG, in his individual** )
**capacity,** )

)

**Serve at:** )
**Buzz Westfall Justice Center** )
**100 South Central Avenue** )
**Clayton, Missouri 63105,** )

)

**and,** )

)

**TERRIANNA BYAS, in her individual** )
**capacity,** )

)

**Serve at:** )
**Buzz Westfall Justice Center** )
**100 South Central Avenue** )

4

Clayton, Missouri 63105,                     )
                                             )
and                                          )
                                             )
MELISSA SUSMAN, in her individual            )
capacity,                                    )
                                             )
Serve at:                                    )
Buzz Westfall Justice Center                 )
100 South Central Avenue                     )
Clayton, Missouri 63105,                     )
                                             )
and                                          )
                                             )
PHYSICIAN DOE, in his/her individual         )
capacity,                                    )
                                             )
Hold for Service,                            )
                                             )
and                                          )
                                             )
JOHN AND JANE DOE                            )
CORRECTIONAL OFFICERS                        )
AND STAFF,                                   )
                                             )
Hold for Service,                            )
                                             )
        Defendants.                          )

## SECOND AMENDED COMPLAINT FOR DAMAGES

COMES NOW Plaintiff Tashonda Troupe, individually and on behalf of Lamar Catchings, deceased, and for her Second Amended Complaint against above-named Defendants, states as follows:

## STATEMENT OF CASE

1.      Lamar Catchings, an otherwise healthy and active nineteen (19) year old, was detained at Defendant St. Louis County's Buzz Westfall Justice Center (aka the "County Jail") and held as a pretrial detainee. Beginning in January to early-February 2019, Mr. Catchings' health

5

and physical condition began to visibly and conspicuously deteriorate. Despite Mr. Catchings' repeated complaints about his physical pain and symptoms to St. Louis County correctional officers and medical staff and, despite the clear and obvious deterioration of his physical condition, St. Louis County and its employees failed to provide Mr. Catchings with proper and adequate medical care and treatment. Instead, in the face of Mr. Catchings' disturbing complaints and the staff's own observations, such as loss of hearing, repeated vomiting and the inability to eat and even walk, St. Louis County's health care staff accused Mr. Catchings of being, a "f---ing faker." However, Mr. Catchings was not "faking", but rather he was suffering from an undiagnosed, progressively debilitating *but highly treatable* form of leukemia, which by February 2019 had advanced to the point where Mr. Catchings was rendered physically unable to walk and jail staff had to carry him up and down stairs and move him around in a wheelchair.

2.      Lamar Catching's death was not sudden, quick, painless, or unexpected. Instead, for over a month prior to his death, Mr. Catchings suffered from the most serious, escalating, and obvious symptoms of his disease to the point he could not function. During his final months, it was obvious and/or should have been obvious to everyone in the jail – detainees, correctional officers, and health care staff – that Mr. Catchings was seriously ill and in extreme distress. In a jail surveillance video of Mr. Catchings, taken eight days before his death, Mr. Catchings is seen unable to stand and slinking down a wall to the floor while detainees try to alert guards of his need for immediate medical attention. However, rather than seek such medical attention for Mr. Catchings, correctional officers instead lifted Mr. Catchings from the floor and transported him back to his cell – instead of to the infirmary, to a doctor, or a hospital.

3.      As Mr. Catching's disease progressed, it became increasingly difficult for him to breathe and almost impossible for him to walk. During this time, Mr. Catchings submitted sick

call forms to St. Louis County jail staff and called out in desperation "I need a doctor!". But, instead of being taken to the infirmary, to a doctor, or sent to a hospital, as other detainees routinely are, Mr. Catchings was only seen three (3) times in the entire month of February, in his cell, by practical nurses, with two of these visits lasting a mere seven (7) minutes each. Moreover, during these truncated visits, health care staff failed to provide even the most basic, standard, and minimal care, such as taking or recording Mr. Catching' vital signs. Additionally, St. Louis County health care staff ignored standing care and treatment orders, which called on the practical nurses, based on Mr. Catchings symptoms, to immediately contact a medical provider, which they repeatedly failed to do, and, on information and belief, Mr. Catchings was routinely treated by underqualified practical nurses with little to no guidance, supervision or discipline by registered nurses, supervisors, and physicians.

4.     Following Mr. Catchings' death, St. Louis County correctional officers and staff admitted to police investigators that they routinely failed to follow the most basic health and welfare policies and such failures were well-known internally among jail staff, by supervisory officers, and to St. Louis County officials.  In fact, on the night of his death, like most if not all of the nights in the month leading up to his death, correctional officers did not make Mr. Catchings stand for the required nightly "sign of life" check. In this atmosphere of total institutional decay and disfunction, jail officers and staff, exposed to and clearly aware of Mr. Catchings' serious and urgent medical needs and deteriorating health and physical condition, routinely, failed to take action to provide him with even the most basic standard of humane treatment and compassionate medical care.  Instead of seeking medical care for Mr. Catchings, correctional officers, including the above-named Defendants, *acknowledged*, but never treated, his worsening illness through accommodations, including bringing food to his cell; carrying him around the facility; moving him

7

to a cell on a lower level due to his inability to walk; and using a wheelchair. At no point in this long and unbearable period of obvious sickness and deterioration did anyone send Mr. Catchings, despite his pleadings, to the jail's infirmary or to a medical provider.

5.    As his final weeks passed, with correctional officers, staff, and detainees witnessing his deteriorating condition and distress, no one took Mr. Catchings, despite his pleadings, to the jail's infirmary, a hospital, and no one called for a doctor, a registered nurse, a nurse supervisor, or 911 emergency responders.  Instead, Mr. Catchings, who was clearly now dying from an undiagnosed but curable form of leukemia, was only provided with "treatment" from licensed practical nurses, one of whom called Mr. Catchings a "f---ing faker" just two (2) days before he would die. Thus, Mr. Catchings ultimately died alone in his cell and from a condition that the St. Louis County Medical Examiner would later report to have been completely diagnosable through a routine blood panel administered by the jail. Mr. Catching's condition was also easily treated and survivable if standard and recognized treatments for his condition had just been provided.  As opined by Dr. Steven Gore, an oncologist at Yale University  acute promyelocytic leukemia (APL) is "cured 97 percent of the time" and "it [is] 'unconscionable' that someone would die from APL and [that] should never happen'".[1]

6.    Defendant St. Louis County was well-aware of the serious and obvious deficiencies with respect to its jail policies and training of jail staff, including policies and training regarding the provision of health services and medical care to its detainees.  Fourteen months prior to Mr. Catchings' unnecessary and untimely death, then-St. Louis County Executive Steve Stenger told his executive staff: "That's one of the greatest powers I have. That I have 52 people who I

---

[1] Kohler, Jeremy, "Lawyer for grieving mother sues St. Louis County for blocking access to jail records", St. Louis Post-Dispatch, April 12, 2019, https://www.stltoday.com/news/local/crime-and-courts/lawyer-for-grieving-mother-sues-st-louis-county-for-blocking-access-to-jail-records/article_fc829054-b50d-5ba5-a4a3-3155714ef0a9.html

hire, and nobody knows where they're coming from.  For instance, there are 2 slots over at the jail. Nobody knows if Julia Childrey [Director of Department of Justice Services] put those people there, or I did.  It's good f---ed up. We like it f---ed up."[2]  Moreover, at the time of his death, Mr. Catchings was the third pretrial detainee to die in the custody of St. Louis County and its jail within a forty-day period.  While the previous two deaths of Larry Reavis and John Shy, occurring immediately before Mr. Catchings' death, quickly became high profile matters of intense public scrutiny, serving as yet another example of deteriorating jail conditions under the leadership of St. Louis County and County Executive Steve Stenger. St. Louis County officials, including then-Jail Director Julia Childrey, failed to take corrective measures to improve these conditions and spare Mr. Catchings the same fate. In fact, the conditions at the County jail were so abysmal and St. Louis County and its jail staff were so indifferent to these conditions that even the high-profile deaths of Mr. Reavis and Mr. Shy, and the subsequent public scrutiny, did not lead to any changes in policies, practices, training, and/or supervision. Instead, Lamar Catchings and his suffering were ignored, as St. Louis County employees *continued* to flagrantly disregard policies and procedures with impunity.  Then, in the months following the death of Mr. Catchings, two more detainees – both young men – would also die in the care and custody of the St. Louis County jail, bringing the total deaths in the St. Louis County Justice Center to five in 2019 alone.  And, as acknowledged by current St. Louis County Executive Sam Page, when asked about internal reports on the jail deaths: "I've got two career attorneys telling me — one's in tears and the other one's very angry — that you can't just release all this stuff that will be impossible for us to defend any sort of litigation."[3]

---

[2] Government's Sentencing Memorandum, United States of America v. Steven Stenger, filed 8/02/2019

[3] Kohler, Jeremy "Why are people dying at the St. Louis County Jail?", St. Louis Post-Dispatch, July 12, 2019, https://www.stltoday.com/news/local/crime-and-courts/why-are-people-dying-at-the-st-louis-county-jail-even-the-head-of-the/article_4dfe3777-75f9-5519-81c2-100a0654e3c5.html

7.      Accordingly, Plaintiff Tashonda Troupe, individually and on behalf of Lamar Catchings (decedent), now brings claims against the above-named individual Defendants for violations of Lamar Catchings' rights as secured by the Constitution of the United States of America, cognizable pursuant to 42 U.S.C. §§ 1983 and 1988, and Missouri state law, including state law claims for negligence, negligence per se and wrongful death.  Further, Plaintiff Tashonda Troupe, individually and on behalf of Lamar Catchings (decedent), brings claims against Defendant Saint Louis County, Missouri and certain St. Louis County officers and officials under theories of municipal liability (*"Monell"* liability), for maintaining unconstitutional policies, practices, and customs as well as for failures to train, supervise, and/or discipline its employees.

## JURISDICTION AND VENUE

8.      Jurisdiction is proper to this Court, pursuant to 28 U.S.C. §§ 1331 and 1343, which provides this Court with original jurisdiction over cases and controversies raising federal questions and claims.  Further, this Court has supplemental jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367.

9.      Venue is proper to this Court as the incidents and events giving rise to Plaintiff's claims arose and occurred within St. Louis County, Missouri and thereby within the geographical boundaries of the Eastern District of Missouri.

## PARTIES

10.     Plaintiff Tashonda Troupe (hereinafter "Plaintiff Troupe") is and was, at all times relevant hereto, a citizen of the United States of America and resident of the State of Missouri. Further, Plaintiff Troupe is a biological parent and mother of Lamar Catchings (hereinafter "Mr. Catchings") and therefore the appropriate party to bring this action for wrongful death, pursuant to 537.080, MO. REV. STAT.

10

11.     Defendant St. Louis County, Missouri (hereinafter "Defendant St. Louis County") is a body politic, municipal corporation, and/or political subdivision of the State of Missouri, organized and existing pursuant to the Missouri Constitution and state law.  Defendant St. Louis County operates the Buzz Westfall Justice Center (hereinafter "Justice Center") through its Department of Justice Services and provides healthcare services to detainees of the Justice Center through the Corrections Medicine Program operated by the St. Louis County Department of Public Health.

12.     Defendant Julia Murphy (previously Julia Childrey and hereinafter "Defendant Murphy") is a citizen of the United States and was, at all times relevant hereto, the acting Director of Defendant St. Louis County's Justice Center.   As the Director of Defendant St. Louis County's Justice Center, Defendant Childrey held final policymaking authority for the operations of the Justice Center and was responsible for the supervision of daily activities in the Justice Center, including but not limited to training and supervision of staff and the implementation and enforcement of policies and procedures at the Justice Center.  For purposes of Plaintiff's federal claims, Defendant Murphy is named in her individual and official capacities.

13.     Defendant Spring Schmidt (hereinafter "Defendant Schmidt") is and was at all times relevant hereto, a citizen of the United States and acting Director and/or Co-Director of Defendant St. Louis County's Department of Public Health.  On information and belief, Defendant Schmidt, as the acting Director and/or Co-Director of Defendant St. Louis County's Department of Public Health, held final policymaking authority for the operations of the Corrections Medicine Program and was operations for the supervision of the provision of health and medical care to detainees in the Justice Center, including but not limited to training and supervision of staff and

11

the implementation and enforcement of health policies and procedures at the Justice Center.  For purposes of Plaintiff's federal claims, Defendant Schmidt is named in her official capacity.

14.     Defendant Emily Douchette (hereinafter "Defendant Douchette") is and was, at all times relevant hereto, a citizen of the United States and the acting Director and/or Co-Director of Defendant St. Louis County's Department of Public Health.  On information and belief, Defendant Douchette, as the acting Director and/or Co-Director of Defendant St. Louis County's Department of Public Health, held final policymaking authority for the operations of the Corrections Medicine Program and was operations for the supervision of the provision of health and medical care to detainees in the Justice Center, including but not limited to training and supervision of staff and the implementation and enforcement of health policies and procedures at the Justice Center.  For purposes of Plaintiff's federal claims, Defendant Douchette is named in her individual and official capacity.

15.     Defendant Dexter Swims (hereinafter "Defendant Swims") is and was, at all times relevant hereto, a citizen of the United States and employed by Defendant St. Louis County at its Justice Center, holding the rank of major.  At all times relevant hereto, Defendant Swims was acting under color of state law and authority of his position with Defendant St. Louis County.  For purposes of Plaintiff's federal claims, Defendant Swims is named in his individual capacity.

16.     Defendant Justin Mohler (hereinafter "Defendant Mohler") is and was, at all times relevant hereto, a citizen of the United States and employed by Defendant St. Louis County at its Justice Center, holding the rank of lieutenant.  At all times relevant hereto, Defendant Mohler was acting under color of state law and authority of his position with Defendant St. Louis County.  For purposes of Plaintiff's federal claims, Defendant Mohler is named in is individual capacity.

12

17.    Defendant Lieutenant Daniel Morgan (hereinafter "Defendant Morgan") is and was, at all times relevant hereto, a citizen of the United States and employed by Defendant St. Louis County at its Justice Center, holding the rank of lieutenant.  At all times relevant hereto, Defendant Morgan was acting under color of state law and authority of his position with Defendant St. Louis County.  For purposes of Plaintiff's federal claims, Defendant Morgan is named in his individual capacity.

18.    Defendant Felicia Collins (hereinafter "Defendant Collins") is and was, at all times relevant hereto, a citizen of the United States and employed by Defendant St. Louis County at its Justice Center, holding the rank of lieutenant.  At all times relevant hereto, Defendant Collins was acting under color of state law and authority of her position with Defendant St. Louis County.  For purposes of Plaintiff's federal claims, Defendant Collins is named in her individual capacity.

19.    Defendant Bryan Kirkbride (hereinafter "Defendant Kirkbride) is and was, at all times relevant hereto, a citizen of the United States and employed by Defendant St. Louis County at its Justice Center, holding the title and/or position of corrections officer.  At all times relevant hereto. Defendant Kirkbride was acting under color of state law and authority of his position with Defendant St. Louis County.  For purposes of Plaintiff's federal claims, Defendant Kirkbride is named in his individual capacity.

20.    Defendant Monika Williams (hereinafter "Defendant Williams") is and was, at all times relevant hereto, a citizen of the United States and employed by Defendant St. Louis County, holding the title and/or position of corrections officer.  At all times relevant hereto, Defendant Williams was acting under color of state law and authority of her position with Defendant St. Louis County.  For purposes of Plaintiff's federal claims, Defendant Williams is named in her individual capacity.

13

21.     Defendant Justin Anderson (hereinafter "Defendant Anderson") is and was, at all times relevant hereto, a citizen of the United States and employed by Defendant St. Louis County at its Justice Center, holding the title and/or position of corrections officer.  At all times relevant hereto, Defendant Anderson was acting under color of state law and authority of his position with Defendant St. Louis County.  For purposes of Plaintiff's federal claims, Defendant Anderson is named in his individual capacity.

22.     Defendant Jordan Atwater (hereinafter "Defendant Atwater") is and was, at all times relevant hereto, a citizen of the United States and employed by Defendant St. Louis County at its Justice Center, holding the title and/or position of corrections officer.  At all times relevant hereto, Defendant Atwater was acting under color of state law and authority of his position with Defendant St. Louis County.  For purposes of Plaintiff's federal claims, Defendant Atwater is named in his individual capacity.

23.     Defendant  Lakeisha Walker (hereinafter "Defendant Walker") is and was, at all times relevant hereto, a citizen of the United States and employed by Defendant St Louis County at its Justice Center, holding the title and/or position of corrections officer.  At all times relevant hereto, Defendant Walker was acting under color of state law and authority of her position with Defendant St. Louis County. For purposes of Plaintiff's federal claims, Defendant Walker is named in her individual capacity.

24.     Defendant Anthony Young (hereinafter "Defendant Young") is and was, at all times relevant hereto a citizen of the United States and employed by Defendant St. Louis County at its Justice Center, holding the title and/or position of nurse.  At all times relevant hereto, Defendant Young was acting under color of state law and authority of his position with Defendant

14

St. Louis County.  For purposes of Plaintiff's federal claims, Defendant Young is named in his individual capacity.

25.      Defendant Terrianna Byas (hereinafter "Defendant Byas") is and was, at all times relevant hereto, a citizen of the United States and employed by Defendant St. Louis County at its Justice Center, holding the title and/or position of nurse.  At all times relevant hereto, Defendant Byas was acting under color of state law and authority of her position with Defendant St. Louis County.  For purposes of Plaintiff's federal claims, Defendant Byas is named in her individual capacity.

26.      Defendant Melissa Susman (hereinafter "Defendant Susman") is and was, at all times relevant hereto, a citizen of the United States and employed by Defendant Saint Louis County, holding the title and/or position of nurse supervisor.  At all times relevant hereto, Defendant Susman was acting under color of state law and authority of her position with Defendant St. Louis County.  For purposes of Plaintiff's federal claims, Defendant Susman is named in her individual capacity.

27.      Defendant Steven Drews (hereinafter "Defendant Drews") is and was, at all times relevant hereto, a citizen of the United States, employed by Defendant St Louis County at its Justice Center, and, on information and belief, held a supervisory rank or title.  At all times relevant hereto, Defendant Drews was acting under color of state law and authority of his position with Defendant St. Louis County. For purposes of Plaintiff's federal claims, Defendant Drews is named in his individual capacity.

28.      Defendant Nathaniel Beard (hereinafter "Defendant Beard") is and was, at all times relevant hereto, a citizen of the United States and employed by Defendant St Louis County at its Justice Center, holding the title and/or position of corrections officer.  At all times relevant hereto,

Defendant Walker was acting under color of state law and authority of her position with Defendant St. Louis County. For purposes of Plaintiff's federal claims, Defendant Beard is named in her individual capacity.

29.     Defendant Rodrick Oliver (hereinafter "Defendant Oliver") is and was, at all times relevant hereto, a citizen of the United States, employed by Defendant St Louis County at its Justice Center, and, on information and belief, held a supervisory rank or title. At all times relevant hereto, Defendant Beard was acting under color of state law and authority of his position with Defendant St. Louis County. For purposes of Plaintiff's federal claims, Defendant Oliver is named in his individual capacity.

30.     Defendant Physician Doe is and was, at all times relevant hereto, a citizen of the United States and employed by Defendant St Louis County at its Justice Center as Director of Corrections Medicine and/or as a licensed physician and medical doctor. At all times relevant hereto, Defendant Physician Doe was acting under color of state law and authority of his/her position with Defendant St. Louis County. For purposes of Plaintiff's federal claims, Defendant Physician Doe is named in his/her individual capacity.

31.     Defendants John and Jane Doe Correctional Officers and Staff were, at all times relevant hereto, employed by Defendant St. Louis County at its Justice Center, holding supervisory ranks and/or titles and/or positions of correctional officers and supervisors and health care staff, including practical nurses and registered nurses. At present, these individuals have yet to be identified by names but were, at all times relevant hereto, acting under color of state law and authority of their positions with Defendant St. Louis County. For purposes of Plaintiff's federal claims, John and Jane Doe Correctional Officers and Staff are named in their individual capacities.

## FACTUAL ALLEGATIONS

16

*General Allegations Common to All Counts and Defendants*

32.     On or about April 17, 2018, Lamar Catchings was placed in detention at Defendant St. Louis County's Buzz Westfall Justice Center while awaiting trial on pending criminal charges.

33.     Mr. Catchings was held in detention, at Defendant St. Louis County's Justice Center, for a period of approximately eleven (11) months, from on or about April 17, 2018 until his death, on or about February 28, 2019.

34.     At the time of his detention, Mr. Catchings was an otherwise healthy, nineteen-year-old, male.

35.     On information and belief, during his detention, Mr. Catchings was a cooperative and compliant detainee with few disciplinary infractions and/or sanctions.

36.     Throughout most of his detention, from approximately April 2018 through January to February 2019, Mr. Catchings was known to be an outgoing, social, and physically active detainee.

37.     On information and belief, sometime in approximately January 2019, Mr. Catchings' health, physical condition, and demeanor began to change and decline to such an extent as to become noticeable to other detainees and correctional officers.

38.     Beginning in early February 2019, Mr. Catchings' behavior, demeanor, and levels of physical activity began to further decline, and he began to exhibit symptoms of illness, including but not limited to loss of appetite; vomiting; hearing loss; dizziness; and marked decrease in levels of physical activity.

39.     By the second week of February 2019, Mr. Catchings' health and physical condition continued to deteriorate, including but not limited to decreasing levels of physical activity; decreasing mobility; dizziness; increasing difficulty in walking; increasing confinement

17

and isolation to his cell; loss of appetite and missing of meals; frequent vomiting if and when he would attempt to eat; headaches; and hearing loss.

40.  By the third week of February 2019, Mr. Catchings' health and physical condition continued to significantly deteriorate further, including but not limited to decreased mobility so as to require the assistance of corrections officers to rise to a standing position; need for a wheelchair for transport him to court appearances; extreme weakness rendering him almost exclusively confined to his bed and cell; dizziness; headaches; visible weight loss; almost complete anorexia and/or inability to eat; and frequent vomiting.

41.  By the fourth week of February 2019, which culminated in Mr. Catchings' death on or about February 28, 2019, Mr. Catchings' health and physical condition at deteriorated to his final stages of life, including inability to leave his bed; complete anorexia and/or inability to eat; vomiting; dizziness; paleness; difficulty breathing; visible weight loss; and near total immobility.

42.  On or about February 28, 2019, Lamar Catchings died alone in his jail cell in Defendant St. Louis County's Buzz Westfall Justice Center at the age of twenty-years-old.

43.  On or about March 1, 2019, corrections officers discovered that Mr. Catchings had died when he did not respond during morning bed check.

44.  At the time when corrections officers found Mr. Catchings dead in his cell, rigor mortis had already begun, and a medical examiner would estimate that Mr. Catchings had been dead for approximately ten (10) hours.

45.  The cause of Lamar Catchings' death was determined to be acute leukemia (probably acute promyelocytic leukemia).

46.  On information and belief, the physical symptoms displayed by Mr. Catchings over the month of February 2019 were consistent with and indicative of a diagnosis of leukemia.

18

47.     On information and belief, acute promyelocytic leukemia is easily and readily diagnosable through a simple blood screening panel.

48.     On information and belief, acute promyelocytic leukemia is a highly treatable form of leukemia with a long-term survival rate of up to 90% with proper diagnosis and treatment.

49.     Despite Mr. Catchings' progressive physical deterioration and obvious need for medical attention, Mr. Catchings was only "examined" by Justice Center medical staff on just three (3) occasions during the month of February 2019.

50.     On the three (3) aforementioned "examinations," Mr. Catchings was examined in his cell by staff members whose medical skill and training was limited to being practical nurses.

51.     Two (2) of the three (3) aforementioned "examinations" lasted seven (7) minutes each.

52.     During the month of February 2019, Mr. Catchings was not, at any time, taken to the infirmary.

53.     During the month of February 2019, Mr. Catchings was not, at any time, examined by a registered nurse.

54.     During the month of February 2019, Mr. Catchings was not, at any time, examined by a licensed physician and/or medical doctor.

55.     During his detention, including the month of February 2019, Mr. Catchings was not, at any time, afforded any opportunity for medical or diagnostic tests, including but not limited to blood tests and screening panels.

56.     During the month of February 2019, Mr. Catchings deteriorating physical condition and undiagnosed leukemia was treated with over-the-counter Tylenol and Zantac (an antacid).

19

57.     As a direct and proximate result of the negligence, carelessness and deliberate indifference of defendants, Mr. Catchings lost a substantial chance of survival.

*Allegations Relating to Defendants Anthony Young, Terrianna Byas, Melissa Susman, Emily Douchette, and Physician Doe*

58.     Defendant Anthony Young was, at all times relevant hereto, employed by Defendant St. Louis County at its Justice Center as a practical nurse (also known as a licensed practical nurse or LPN).

59.     Defendant Terrianna Byas was, at all times relevant hereto, employed by Defendant St. Louis County at its Justice Center as a practical nurse (also known as a licensed practical nurse or LPN).

60.     Pursuant to Missouri's "Nursing Practices Act," Chapter 335, MO. REV. STAT., practical nurses are required, at all times, to be under the "guidance or supervision provided by a person licensed by a state regulatory board to prescribe medications and treatments or a registered professional nurse . . ." § 335.016(14) MO. REV. STAT.

61.     Pursuant to Missouri's "Nursing Practices Act," Chapter 335, MO. REV. STAT., registered professional nurses are allowed, *inter alia*, to "administ[er] . . . medications and treatments as prescribed by a person licensed by a state regulatory board to prescribe medications and treatments." § 335.016(15)(c), MO. REV. STAT.

62.     On information and belief, Defendant Melissa Susman was, at all times relevant hereto, employed by Defendant St. Louis County as a nurse supervisor at its Justice Center.

63.     On information and belief, Defendant Susman is a registered nurse and licensed by the State of Missouri Board of Nursing.

64. On information and belief, Defendant Susman was responsible for guidance and supervision of Defendants Young and Byas, including but not limited to review of Defendant Young and Byas' notes and records of interactions with patients and detainees.

65. On information and belief, Defendant Emily Doucette is and was, at all times relevant hereto, employed by Defendant St. Louis County as a Co-Director of the Department of Public Health.

66. On information and belief, Defendant Doucette is and was, at all times relevant hereto, a licensed medical doctor and in good-standing to engage in the practice of medicine, including the prescribing of medications and treatments.

67. On information and belief, Defendant Physician Doe was, at all times relevant hereto, employed by Defendant St. Louis County as its Chief of Medical Services, Corrections Medicine at the Buzz Westfall Justice Center.

68. On information and belief, Defendant Physician Doe is and was, at all times relevant hereto, a licensed medical doctor and in good-standing to engage in the practice of medicine, including the prescribing of medications and treatments.

69. On information and belief, Defendant Physician Doe succeeded Mary Hastings as Defendant St. Louis County's Chief of Medical Services, Corrections Medicine and assumed all the duties and responsibilities of his/her job title.

70. Through standing orders, issued by Defendants Doucette and Physician Doe (as successor to Mary Hastings), Defendants Doucette and Physician Doe dictated and prescribed the treatments to be provided by Justice Services' nursing staff, including both its registered and practical nurses, based upon the detainee's symptoms and/or staff's observations of the detainees and his/her symptoms and condition.

71. On information and belief, Justice Services' nursing staff is required, pursuant to the standing orders, to check and record a detainee 's vital signs, including but not limited to temperature, heart rate, and blood pressure, each time nursing staff performs a health care examination or consultation with a detainee .

72. On information and belief, Defendants Doucette and Physician Doe were responsible for the guidance and supervision Defendants Susman, Young, and Byas, including but not limited to review of Defendant Susman, Young, and Byas' notes and records of interactions with patients and detainees.

> i.   *Defendant Young's February 18, 2019 Examination of Mr. Catchings*

73. During the second week of February 2019, a female correctional officer observed a noticeable change in Mr. Catchings' behavior, including that he seldom left his cell or ate his meals.

74. During this same second week of February 2019, this same aforementioned correctional officer noticed and/or was told by Mr. Catchings that he was having difficulty hearing her when she spoke to him through his cell door.

75. During this same second week of February 2019, this same aforementioned correctional officer noted and/or was told by Mr. Catchings that he vomited when he ate.

76. This aforementioned correctional officer encouraged Mr. Catchings to come to the guard podium to obtain a "sick call" form.

77. When Mr. Catchings informed her that he was unable to walk to the guard podium, this aforementioned correctional officer delivered a "sick call" form to Mr. Catchings.

78. On information and belief, Mr. Catchings submitted a "sick call" form but at least two (2) days passed without Mr. Catchings' receiving a response to his request.

79.     On information and belief, when the aforementioned correctional officer learned that Mr. Catchings' had not yet received a response to his "sick call" request, she requested and/or encouraged Mr. Catchings request that medical personnel come to him in his cell.

80.     On or about February 18, 2019, Defendant Young consulted with Mr. Catchings in his cell.

81.     On information and belief, Mr. Catchings informed Defendant Young that he was experiencing headaches, dizziness, and hearing loss.

82.     On information and belief, the aforementioned correctional officer spoke with Defendant Young and informed him that Mr. Catchings reported vomiting when he ate.

83.     Defendant Young's consultation with Mr. Catchings, on or about February 18, 2019, lasted a total seven (7) minutes, from 1:22 p.m. until 1:29 p.m.

84.     Defendant Young recorded Mr. Catchings' health concerns as limited to "headache."

85.     Defendant Young failed to fully and/or accurately record Mr. Catchings' health concerns in his notes and/or Mr. Catchings' medical history, by omitting any and all reference to hearing loss, dizziness, and/or vomiting.

86.     Pursuant to Defendant Doucette's standing orders, a medical provider should be contacted for further orders if a complaint of a "headache" is coupled with abnormal vital signs and/or dizziness or weakness.

87.     On information and belief, Defendants Doucette and/or Physician Doe have authorized separate standing orders specifying protocols and treatments when and detainee reports vomiting.

88.    On information and belief, Defendant Young failed to take Mr. Catchings' vital signs and/or failed to record Mr. Catchings' vital signs in his notes and Mr. Catchings' medical records.

89.    As Mr. Catchings was displaying symptoms of a headache coupled with dizziness, Defendant Doucette and Physician Doe's standing order required that Defendant Young contact a medical provider.

90.    On information and belief, Defendant Young failed to notify any medical provider of Mr. Catchings' symptoms and condition, as required by Defendant Doucette and Physician Doe's standing order.

91.    Instead of contacting a medical provider, Defendant Young instructed Mr. Catchings to take Tylenol.

92.    On information and belief, Defendants Susman, Doucette, and/or Physician Doe failed to review Defendant Young's notes and medical report regarding his consultation with Mr. Catchings, on or about February 18, 2019.

93.    Based on a review of Defendant Young's notes and medical report, regarding his February 18, 2019 consultation with Mr. Catchings, Defendants Susman, Doucette, and/or Physician Doe would have known and/or should have known that Defendant Young only spent seven (7) minutes with Mr. Catchings and/or failed to take and/or Mr. Catchings' vital signs.

94.    On information and belief, Defendant Young discussed Mr. Catchings and his condition with the aforementioned correctional officer following his consultation with Mr. Catchings.

95.     Defendant Young told the aforementioned corrections officer that he was unconcerned with Mr. Catchings' vomiting, as Mr. Catchings was not vomiting blood nor was there any blood in his stool.

96.     On information and belief, by February 18, 2020, Mr. Catchings' deteriorating physical condition and serious need for medical attention was readily apparent to Mr. Catchings' fellow detainees.

97.     On information and belief, by February 18, 2020, Mr. Catchings' deteriorating physical condition and serious need for medical attention was readily apparent to Justice Center's correctional officers, including but not limited to the aforementioned female correctional officer.

98.     On information and belief, this aforementioned correctional officer had direct communications with Defendant Young in which she expressed her concerns regarding Mr. Catchings physical condition and need for medical attention.

99.     On information and belief, as of on or about February 18, 2019, Defendant Young knew and/or should have known of Mr. Catchings' physical condition and serious need for medical attention, based upon his direct observations of Mr. Catchings, statements made to him by Mr. Catchings, and/or statements made to him by correctional staff.

100.    Even though Defendant Young knew and/or should have known of Mr. Catchings serious need for medical attention, he failed to provide him with adequate medical care and attention, including but not limited to having him transferred to the infirmary, to the hospital, and/or contacting a medical provider, such as a registered nurse and/or physician.

*ii.     Defendant Byas' February 22, 2019 Examination of Mr. Catchings*

101.    By February 22, 2019, Mr. Catchings' condition had deteriorated to the extent that he was unable to walk without assistance from the corrections staff.

102.    On or about February 22, 2019, other detainees noted that Mr. Catchings could "hardly move."

103.    Defendant Catchings was scheduled for a court appearance, on or about February 22, 2019.

104.    Prior to being transported to his February 22, 2019 court appearance, Mr. Catchings reported to correctional staff, including Defendant Mohler, that he was feeling unwell.

105.    On information and belief, prior to transporting Mr. Catchings to his February 22, 2019 court appearance, Defendant Mohler observed that Mr. Catchings was visibly weak, dizzy, and unable to stand.

106.    Prior to being transported to his February 22. 2019 court appearance, Mr. Catchings was noticeably and visibly sick and vomiting.

107.    As the result of Mr. Catchings physical condition and inability to walk on his own, Justice Center correctional officers carried him down the stairs from his cell to the ground floor and used a wheelchair to transport him to his court appearance.

108.    Upon returning from his court appearance, on or about February 22, 2019, Mr. Catchings continued to report to corrections staff that he felt sick and unwell and, on information and belief, requested to be taken to the infirmary.

109.    At approximately 10:27 p.m., on or about February 22, 2019, Mr. Catchings was seen in his cell by Defendant Byas.

110.    Defendant Byas' consultation with and/or examination of Mr. Catchings lasted seven (7) minutes, from 10:27 p.m. until 10:34 p.m.

111.    Defendant Byas' indicated that the basis of her visit to Mr. Catchings was complaints of him having a "headache."

112.    On information and belief, Mr. Catchings informed Defendant Byas that he was dizzy and had vomited.

113.    Pursuant to Defendant Doucette's standing orders, a medical provider should be contacted for further orders if the complaint of a "headache" is coupled with abnormal vital signs and/or dizziness or weakness.

114.    Despite the fact that Defendant Byas knew that Mr. Catchings was suffering from a "headache" coupled with dizziness, she failed to contact a medical provider, as required by her standing orders.

115.    On information and belief, Defendants Doucette and/or Physician Doe have issued and/or authorized separate standing orders specifying protocols and treatment when a detainee reports vomiting.

116.    On information and belief, despite the fact that Mr. Catchings had reported vomiting to Defendant Byas, Defendant Byas failed to follow the standing orders with respect to protocols and treatments relating to complaints of vomiting.

117.    Instead of contacting a medical provider, Defendant Byas told Mr. Catchings to complete another "sick call" form if he was not better by the morning.

118.    On information and belief, Defendants Susman, Doucette, and/or Physician Doe failed to review Defendant Byas' notes and medical report regarding her February 22, 2019 consultation with Mr. Catchings.

119.    Based on a review of Defendant Byas' notes and medical report, regarding her February 18, 2019 consultation with Mr. Catchings, Defendants Susman, Doucette, and/or Physician Doe would have known and/or should have known that Defendant Young only spent seven (7) minutes with Mr. Catchings and failed to follow the standing orders requiring that a

27

medical provider be contacted if a detainee  is experiencing a headache coupled with dizziness and vomiting.

120.    On information and belief, by February 22, 2019, Mr. Catchings' deteriorating physical condition and serious need for medical attention was readily apparent to Mr. Catchings' fellow detainees.

121.    On information and belief, by February 22, 2019, Mr. Catchings' deteriorating physical condition and serious need for medical attention was readily apparent to Justice Center's correctional officers, including but not limited to his physical weakness, vomiting, and inability to stand, walk to court and the need for assistance of a wheelchair that same morning.

122.    On information and belief, Defendant Byas had access to Defendant Young's previous notes and records of his February 18, 2019 interactions with Mr. Catchings.

123.    On information and belief, as of on or about February 22, 2019, Defendant Byas knew and/or should have known of Mr. Catchings' physical condition and serious need for medical attention, based upon his direct observations of Mr. Catchings, statements made to her by Mr. Catchings, statements made to her by correctional officers and staff, and/or Mr. Catchings medical files and records.

124.    Despite the fact that Defendant Byas knew and/or should have known of Mr. Catchings serious need for medical attention, she failed to provide him with adequate medical care and attention, including but not limited to having him transferred to the infirmary, a hospital, and/or contacting a medical provider, such as a registered nurse and/or physician.

*iii.    Defendant Young's February 26, 2019 examination of Mr. Catchings.*

125.    On information and belief, sometime after February 23, 2019 and before February 28, 2019, Defendant Williams provided Mr. Catchings with a "sick call" form.

28

126.    Upon receiving the sick call form, Mr. Catchings stated to Defendant Williams that "nothing was going to happen" because neither of his previous two sick calls had resulted in him being able visit to the infirmary or examined by a medical doctor.

127.    By February 26, 2019, Mr. Catchings was unable to descend the stairs to get to Commissary and, on information and belief, he again requested to be taken to the infirmary and/or seen by a medical doctor.

128.    Instead of sending Mr. Catchings to the infirmary or hospital and/or arranging for a physician, registered nurse, and/or nurse supervisor to examine Mr. Catchings, Defendant Young again consulted with Mr. Catchings in his cell.

129.    During this February 22, 2019 visit, Mr. Catchings reported, among other symptoms, heartburn and vomiting.

130.    During this February 22, 2019 visit, Defendant Young failed to take Mr. Catchings' vitals and/or failed to record such vitals in his notes and/or Mr. Catchings' medical file.

131.    Despite the fact that Department of Health and Justice Center written policy dictates that heartburn coupled with vomiting should be reported to a medical provider, Defendant Young did not report Mr. Catchings' symptoms to any medical provider but instead gave him an over-the-counter antacid (Zantac).

132.    Mr. Catchings informed Defendant Young that he was dizzy, had been vomiting, was experiencing a burning sensation in his chest, and could not walk.

133.    Defendant Mohler stated to Defendant Young that he had witnessed Mr. Catchings vomiting.

134.    Defendant Young verified that Mr. Catchings had vomited by looking in Mr. Catchings' trash can.

135.    Despite weeks of vomiting, Mr. Catchings' inability to walk, and other symptoms, as reported by both Mr. Catchings, fellow detainees, and correctional officers, Defendant Young told Mr. Catchings that he believed Mr. Catchings was "faking" and he needed to "stop this behavior."

136.    Defendant Young stated that if Mr. Catchings did not "stop this behavior," he would "charge" Mr. Catchings and have disciplinary sanctions imposed.

137.    After leaving Mr. Catchings' cell, Defendant Young stated to Defendant Mohler that "There is nothing wrong with him.  He is a f***ing faker." (or words to that effect).

138.    On information and belief, Defendant Mohler requested that Defendant Young schedule Mr. Catchings for "clinic," meaning see a registered nurse and/or medical doctor.

139.    On information and belief, Defendant Young indicated that he would schedule Mr. Catchings for "clinic."

140.    On information and belief, Defendant Young failed to schedule Mr. Catching for "clinic."

141.    Approximately two (2) days after Defendant Young accused Mr. Catchings of being a "f***ing faker," Mr. Catchings died from acute leukemia (probable acute promyelocytic leukemia).

142.    On information and belief, by February 26, 2020, Mr. Catchings' deteriorating physical condition and serious need for medical attention was readily apparent to Mr. Catchings' fellow detainees.

143.    On information and belief, by February 26, 2020, Mr. Catchings' deteriorating physical condition and serious need for medical attention was readily apparent to Justice Center's correctional officers.

144. On information and belief, as of on or about February 18, 2019, Defendant Young knew and/or should have known of Mr. Catchings' physical condition and serious need for medical attention, based upon his direct observations of Mr. Catchings, statements made to him by Mr. Catchings, and/or statements made to him by correctional staff.

145. Despite the fact that Defendant Young knew and/or should have known of Mr. Catchings serious need for medical attention, he failed to provide him with adequate medical care and attention, including but not limited to having him transferred to the infirmary, a hospital, and/or contacting a medical provider, such as a registered nurse and/or physician.

146. On information and belief, Defendant Susman was made aware of Mr. Catchings and his medical concerns at some point following Defendant Young's final consultation, on or about February 26, 2019.

147. On information and belief, after Mr. Catching's death, Defendant Susman informed the St. Louis County medical examiner that Mr. Catchings had been "acting weird" in the few days immediately prior to his death.

148. On information and belief, Defendant Susman expressed her opinion to the Medical Examiner that Mr. Catchings' symptoms and physical condition was and/or may have been the result of taking illegal narcotics.

149. The post-mortem examination of Mr. Catchings indicated that he had no illegal narcotics in his system at the time of his death.

150. On information and belief, Defendant Susman's opinions regarding illegal narcotic use among detainees, including her opinions regarding Mr. Catchings, had a detrimental effect on the levels of care provided by Defendant Susman and the staff members whom she supervised.

*Allegations Relating to Correctional Officers and Staff, including Individually-Named Defendants and John and Jane Doe Correctional Officers and Staff*

31

*i.   Allegations Relating Mr. Catchings' deteriorating health and physical condition and Correctional Staff's Knowledge and Notice Thereof*

151.   On information and belief, Defendant St. Louis County Justice Center staff, including the individually-named correctional and supervisory officers and Defendants John and Jane Doe Correctional Officers and Staff, were familiar with Mr. Catchings and his previous outgoing and social nature and levels of physical activity.

152.   On information and belief, throughout the month of February 2019, Justice Services' staff, including the individually-named Defendant correctional and supervisory officers and Defendants John and Jane Doe Correctional Officers and Staff, recognized and/or should have recognized the aforementioned changes in Mr. Catchings' behavior, demeanor, and health, including but not limited to his decreased levels of physical activity, loss of appetite, vomiting, loss of mobility, infrequency of leaving his cell, trouble hearing, standing, walking and other symptoms of illness.

153.   In recognition of Mr. Catchings deteriorating health and physical conditions, Justice Center staff made adjustments to Mr. Catchings living conditions, including but not limited to:

a.   arranging for him to have his meals delivered to his cell as he was unable to walk to the common meal area;

b.   moving him to a cell on a lower floor as he was unable to climb stairs and/or was considered to be at risk of falling on the stairs; and

c.   heightened observation and awareness of his condition, frequency of leaving his cell, and tracking when and how much he ate.

154.    On information and belief, over the course of February 2019, Justice Services' staff, including but not limited to the individually-named Defendant correctional officers and supervisory staff had multiple internal discussions regarding Mr. Catchings and his deteriorating physical condition and health, including but not limited to the facts that he rarely left his cell, couldn't walk, and had stopped eating his meals.

155.    On information and belief, Justice Services' staff, including the individually-named Defendant correctional officers and supervisory staff and/or Defendants John and Jane Doe Correctional Officers and Staff, knew and/or should have known that, in February 2019, Mr. Catchings made multiple requests for medical care and/or attention, including but not limited to being taken to the infirmary and/or to be seen by a physician.

156.    On information and belief, Justice Services' staff, including the individual-named Defendant correctional officers and supervisory staff and/or Defendants John and Jane Doe Correctional Officers and Staff, knew and/or should have known that, prior to January 2019, Mr. Catchings rarely, if ever, complained about his health and/or had never previously received and/or requested medical care and/or treatment.

157.    On information and belief, during February 2019, Defendant Williams observed Mr. Catchings' lethargy, weakness, and other signs of medical distress on additional occasions but failed and/or refused to take any steps to request and/or obtain medical care, examination, or treatment for Mr. Catchings.

158.    During the week of February 17, 2019, Mr. Catchings made Defendant Williams aware of his serious need for medical treatment and care by reporting to Defendant Williams that he was having difficulty hearing, could not walk, and could not eat without vomiting.

159.    On or about February 22, 2019, Defendants Anderson, Walker, and Mohler recognized and/or should have recognized Mr. Catchings' serious medical condition and need for medical care and treatment when they observed him unable to stand and/or walk under his own power.

160.    Rather than obtain medical care and treatment for Mr. Catchings, Defendants Anderson, Walker, and Mohler instead physically carried Mr. Catchings down the stairs and obtained a wheelchair to transport him to his court appearance.

161.    On information and belief, during this aforementioned transport, Mr. Catchings reiterated his pain to Defendants Anderson, Walker, Ross, and Mohler.

162.    Upon his return from his court appearance, Mr. Catchings continued to report to Defendants Anderson, Walker, and/or Mohler that he was not well and needed medical attention.

163.    Upon Mr. Catchings' return from court, and detainee  observed Mr. Catchings' physical condition and advocated for Mr. Catchings to be taken to the infirmary.

164.    In response, Defendant Walker told the aforementioned detainee  to "shut up and mind his business before he received lockdown time" or words to that effect.

165.    Mr. Catchings was then returned to his cell and the wheelchair was taken away.

166.    After being returned to his cell, on or about February 22, 2019, Mr. Catchings continued vomiting and asked to be taken to the infirmary.

167.    By February 26, 2019, Mr. Catchings was unable to descend the stairs to get to Commissary and he again pleaded for a doctor or a trip to the infirmary.

168.    On or about February 26, 2019, Mr. Catchings was seen in his cell by Defendant Young.

169.    Following his examination of Mr. Catchings, Defendant Young expressed his opinion to Defendant Mohler that Mr. Catchings was a "f***ing faker."

170.    On information and belief, Defendant Mohler knew and/or should have known from Defendant Young's comments that Mr. Catchings was not being provided with adequate medical care and treatment.

171.    On February 26, 2019, Defendant Collins authorized Mr. Catchings to be moved to a cell on a lower level.

172.    Defendant Collins authorized this move because correctional officers had reported that Mr. Catchings was unable to walk down the stairs and he was concerned that Mr. Catchings was at risk of falling when climbing stairs.

173.    On information and belief, while being moved from his cell, on or about February 26, 2019, Mr. Catchings' vomited in front of Defendants Mohler and Walker.

174.    On February 26, 2019, despite observing Mr. Catchings' vomiting and difficulties in standing and walking, Defendants Collins, Mohler, and Walker failed to take Mr. Catchings to the infirmary and/or obtain medical care and treatment for his clear and serious medical needs.

175.    On or about February 28, 2019, at 2:05 p.m., Mr. Catchings did not stand for the count during Defendant Williams' rounds.

176.    On information and belief, Justice Services policies dictate that detainees be required to stand during rounds, at least in part to afford correctional officers the opportunity to assess their physical well-being.

177.    On or about 28, 2019, at 2:55 p.m., Mr. Catchings still could not stand and did not respond to Defendant Williams knocks on his cell door, resulting in Defendant Williams contacting the floor Unit Control.

35

178.   In response to Defendant Williams reports to Unit Control, Defendants Swims, Drews, Beard, Jackson, and/or Oliver, a full coterie of five St. Louis County employees, descended on Mr. Catchings' cell in response to Defendant Williams' report that Mr. Catchings was unresponsive.

179.   On information and belief, Defendant Swims reported knocked on Mr. Catchings' door until Mr. Catchings lifted his head, had a short exchange of words, and then Defendants Swim, Drews, Beard, Jackson, and/or Oliver all left without making Mr. Catchings stand or otherwise ensure that he received medical attention.

180.   Defendants Swims, Drews, Beard, Jackson, and/or Oliver violated Justice Services' policies and procedures which required, at minimum, that defendants make Mr. Catchings' stand in order to properly assess his health and physical condition.

181.   Defendants Swims, Drews, Beard, Jackson, and/or Oliver also violated Justice Services' policies and procedures by not requesting a medical provider or Mr. Catchings to the infirmary upon realizing that he could not stand and/or was otherwise unresponsive.

182.   On information and belief, at approximately 4:00 p.m., on or about February 28, 2019, detainees heard Mr. Catchings exclaim from his cell "I need to see a doctor!"

183.   On information and belief, correctional officers did not respond to Mr. Catchings' calls for assistance.

184.   Later that night, on or about February 28, 2019, at approximately 9:00 p.m., Defendant Williams attempted to speak with Mr. Catchings through his cell door.

185.   When Mr. Catchings failed to respond to Defendant Williams, she failed to enter the cell to check on Mr. Catchings' health and instead simply walked away.

186.     On or about February 28, 2019, at approximately 10:15 pm, Defendant Kirkbride began doing rounds on his shift.

187.     Pursuant to Justice Services' policy, detainees are to stand during the 10:15 p.m. rounds so that correctional officers can verify their health and wellbeing.

188.     This St. Louis County detainee standing policy is known internally as a "sign of life" check.

189.     Defendant Williams did not make Mr. Catchings' stand for this "sign of life" check.

190.     On information and belief, Justice Services' staff and correctional routinely ignored this "sign of life" policy.

*ii.     Allegations Relating to Defendant Dexter Swims*

191.     During the period of Mr. Catchings' detention, Defendant Swims was employed by St. Louis County at its Buzz Westfall Justice Center and, on information and belief, held the supervisory rank of major.

192.     On information and belief, during the period of Mr. Catchings' detention and including the month of February 2019, Defendant Swims personally observed, interacted with, and/or was aware of Mr. Catchings and his deteriorating health and physical condition.

193.     On information and belief, Defendant Swims knew and/or should have known that Mr. Catchings' deteriorating health and physical condition required immediate medical care and attention.

194.     On information and belief, Defendant Swims was aware of and/or participated in internal discussions and communications regarding Mr. Catchings and his deteriorating health and physical condition.

195.    On information and belief, Defendant Swims had access to Mr. Catchings' jail records, including but not limited to records discussing his deteriorating health and physical condition and indicating that he had not been examined by the jail's physicians, taken to the infirmary, and/or received adequate medical care.

196.    Despite the fact that he knew and/or should have known of Mr. Catchings' need for medical care and treatment and had the authority and/or ability to takes measures to remedy the lack of adequate medical care being provided to Mr. Catchings, Defendant Swims failed to intervene and thereby, with deliberate indifference, either approved of Mr. Catchings' lack of adequate medical care and/or turned a blind eye to Mr. Catchings' condition and his need for medical care.

*iii.    Allegations Relating to Defendant Justin Mohler*

197.    During the period of Mr. Catchings' detention, Defendant Mohler was employed by St. Louis County at its Buzz Westfall Justice Center and, on information and belief, held the supervisory rank of lieutenant.

198.    On information and belief, during the period of Mr. Catchings' detention and including the month of February 2019, Defendant Mohler personally observed, interacted with, and/or was aware of Mr. Catchings and his deteriorating health and physical condition.

199.    On information and belief, Defendant Mohler knew and/or should have known that Mr. Catchings' deteriorating health and physical condition required immediate medical care and attention.

200.    On information and belief, Defendant Mohler was aware of and/or participated in internal discussions and communications regarding Mr. Catchings and his deteriorating health and physical condition.

201.   On information and belief, Defendant Mohler had access to and/or reviewed Mr. Catchings' jail records, including but not limited to records discussing his deteriorating health and physical condition and indicating that he had not been examined by the jail's physicians, taken to the infirmary and/or received adequate medical care.

202.   Despite the fact that he knew and/or should have known of Mr. Catchings' need for medical care and treatment and had the authority and/or ability to takes measures to remedy the lack of adequate medical care being provided to Mr. Catchings, Defendant Mohler failed, with deliberate indifference, to intervene and thereby either approved of Mr. Catchings' lack of adequate medical care and/or turned a blind eye to Mr. Catchings' condition and his need for medical care.

*iv.*   *Allegations Relating to Defendant Daniel Morgan*

203.   During the period of Mr. Catchings' detention, Defendant Morgan was employed by St. Louis County at its Buzz Westfall Justice Center and, on information and belief, held the supervisory rank of lieutenant.

204.   On information and belief, during the period of Mr. Catchings' detention and including the month of February 2019, Defendant Morgan personally observed, interacted with, and/or was aware of Mr. Catchings and his deteriorating health and physical condition.

205.   On information and belief, during the month of February 2019, Defendant Morgan knew and/or should have known that Mr. Catchings' deteriorating health and physical condition required immediate medical care and attention.

206.   On information and belief, Defendant Morgan was aware of and/or participated in internal discussions and communications regarding Mr. Catchings and his deteriorating health and physical condition.

207.    On information and belief, Defendant Morgan had access to and/or reviewed Mr. Catchings' jail records, including but not limited to records discussing his deteriorating health and physical condition and indicating that he had not been examined by the jail's physicians, taken to the infirmary, and/or received adequate medical care for his readily apparent deteriorating health and physical condition.

208.    Despite the fact that he knew and/or should have known of Mr. Catchings' need for medical care and treatment and had the authority and/or ability to takes measures to remedy the lack of adequate medical care being provided to Mr. Catchings, Defendant Morgan failed, with deliberate indifference, to intervene and thereby either approved of Mr. Catchings' lack of adequate medical care and/or turned a blind eye to Mr. Catchings' condition and his need for medical care.

*v.    Allegations Relating to Defendant Felicia Collins*

209.    During the period of Mr. Catchings' detention, Defendant Collins was employed by St. Louis County at its Buzz Westfall Justice Center and, on information and belief, held the supervisory rank of lieutenant.

210.    On information and belief, during the period of Mr. Catchings' detention and including the month of February 2019, Defendant Collins personally observed, interacted with, and/or was aware of Mr. Catchings and his deteriorating health and physical condition.

211.    On information and belief, Defendant Collins knew and/or should have known that Mr. Catchings' deteriorating health and physical condition required immediate medical care and attention.

212.    On information and belief, Defendant Collins was aware of and/or participated in internal discussions and communications regarding Mr. Catchings and his deteriorating health and physical condition.

213.    On information and belief, Defendant Collins had access to and/or reviewed Mr. Catchings' jail records, including but not limited to records discussing his deteriorating health and physical condition and indicating that he had not been examined by the jail's physicians, taken to the infirmary, and/or received adequate medical care.

214.    Despite the fact that she knew and/or should have known of Mr. Catchings' need for medical care and treatment and had the authority and/or ability to takes measures to remedy the lack of adequate medical care being provided to Mr. Catchings, Defendant Collins failed, with deliberate indifference, to intervene and thereby either approved of Mr. Catchings' lack of adequate medical care and/or turned a blind eye to Mr. Catchings' condition and his need for medical care.

*vi.    Allegations Relating to Defendant Bryan Kirkbride*

215.    During the period of Mr. Catchings' detention, Defendant Kirkbride was employed by St. Louis County at its Buzz Westfall Justice Center and, on information and belief, held the title of corrections officer.

216.    On information and belief, during the period of Mr. Catchings' detention and including the month of February 2019, Defendant Kirkbride personally observed, interacted with, and/or was aware of Mr. Catchings and his deteriorating health and physical condition.

217.    On information and belief, Defendant Kirkbride knew and/or should have known that Mr. Catchings' deteriorating health and physical condition needed immediate medical care and attention.

41

218.    On information and belief, Defendant Kirkbride was aware of and/or participated in internal discussions and communications regarding Mr. Catchings and his deteriorating health and physical condition.

219.    On information and belief, Defendant Kirkbride had access to and/or reviewed Mr. Catchings' jail records, including but not limited to records discussing his deteriorating health and physical condition and indicating that he had not been examined by the jail's physicians, taken to the infirmary, and/or received adequate medical care for his readily apparent deteriorating health and physical condition.

220.    Despite the fact that he knew and/or should have known of Mr. Catchings' need for medical care and treatment and had the authority and/or ability to takes measures to remedy the lack of adequate medical care being provided to Mr. Catchings, Defendant Kirkbride failed, with deliberate indifference, to intervene and thereby either approved of Mr. Catchings' lack of adequate medical care and/or turned a blind eye to Mr. Catchings' condition and his need for medical care.

*vii.    Allegations Relating to Defendant Monika Williams*

221.    During the period of Mr. Catchings' detention, Defendant Williams was employed by St. Louis County at its Buzz Westfall Justice Center and, on information and belief, held the title of corrections officer.

222.    On information and belief, during the period of Mr. Catchings' detention and including the month of February 2019, Defendant Williams personally observed, interacted with, and/or was aware of Mr. Catchings and his deteriorating health and physical condition.

223.     On information and belief, Defendant Williams knew and/or should have known that Mr. Catchings' deteriorating health and physical condition required immediate medical care and attention.

224.     On information and belief, Defendant Williams was aware of and/or participated in internal discussions and communications regarding Mr. Catchings and his deteriorating health and physical condition.

225.     On information and belief, Defendant Williams had access to and/or reviewed Mr. Catchings' jail records, including but not limited to records discussing his deteriorating health and physical condition and indicating that he had not been examined by the jail's physicians, taken to the infirmary, and/or received adequate medical care.

226.     Despite the fact that she knew and/or should have known of Mr. Catchings' need for medical care and treatment and had the authority and/or ability to takes measures to remedy the lack of adequate medical care being provided to Mr. Catchings, Defendant Williams, with deliberate indifference, failed to intervene and thereby either approved of Mr. Catchings' lack of adequate medical care and/or turned a blind eye to Mr. Catchings' condition and his need for medical care.

*viii.    Allegations Relating to Defendant Justin Anderson*

227.     During the period of Mr. Catchings' detention, Defendant Anderson was employed by St. Louis County at its Buzz Westfall Justice Center and, on information and belief, held the title of corrections officer.

228.     On information and belief, during the period of Mr. Catchings' detention and including the month of February 2019, Defendant Anderson personally observed, interacted with, and/or was aware of Mr. Catchings and his deteriorating health and physical condition.

43

229.    On information and belief, Defendant Anderson knew and/or should have known that Mr. Catchings' deteriorating health and physical condition required immediate medical care and attention.

230.    On information and belief, Defendant Anderson was aware of and/or participated in internal discussions and communications regarding Mr. Catchings and his deteriorating health and physical condition.

231.    On information and belief, Defendant Anderson had access to and/or reviewed Mr. Catchings' jail records, including but not limited to records discussing his deteriorating health and physical condition and indicating that he had not been examined by the jail's physicians or taken to the infirmary and/or had not received adequate medical care.

232.    Despite the fact that he knew and/or should have known of Mr. Catchings' need for medical care and treatment and had the authority and/or ability to takes measures to remedy the lack of adequate medical care being provided to Mr. Catchings, Defendant Anderson failed, with deliberate indifference, to intervene and thereby either approved of Mr. Catchings' lack of adequate medical care and/or turned a blind eye to Mr. Catchings' condition and his need for medical care.

ix.    *Allegations Relating to Jordon Atwater*

233.    During the period of Mr. Catchings' detention, Defendant Atwater was employed by St. Louis County at its Buzz Westfall Justice Center and, on information and belief, held the title of corrections officer.

234.    On information and belief, during the period of Mr. Catchings' detention and including the month of February 2019, Defendant Atwater personally observed, interacted with, and/or was aware of Mr. Catchings and his deteriorating health and physical condition.

235.    On information and belief, Defendant Atwater knew and/or should have known that Mr. Catchings' deteriorating health and physical condition required immediate medical care and attention.

236.    On information and belief, Defendant Atwater was aware of and/or participated in internal discussions and communications regarding Mr. Catchings and his deteriorating health and physical condition.

237.    On information and belief, Defendant Atwater had access to and/or reviewed Mr. Catchings' jail records, including but not limited to records discussing his deteriorating health and physical condition and indicating that he had not been examined by the jail's physicians, taken to the infirmary, and/or received adequate medical care.

238.    Despite the fact that he knew and/or should have known of Mr. Catchings' need for medical care and treatment and had the authority and/or ability to takes measures to remedy the lack of adequate medical care being provided to Mr. Catchings, Defendant Atwater, failed to intervene and thereby, with deliberate indifference, either approved of Mr. Catchings' lack of adequate medical care and/or turned a blind eye to Mr. Catchings' condition and his need for medical care.

x.    *Allegations Relating to Defendant Lakeisha Walker*

239.    During the period of Mr. Catchings' detention, Defendant Walker was employed by St. Louis County at its Buzz Westfall Justice Center and, on information and belief, held the title of corrections officer.

240.    On information and belief, during the period of Mr. Catchings' detention and including the month of February 2019, Defendant Walker personally observed, interacted with, and/or was aware of Mr. Catchings and his deteriorating health and physical condition.

45

241.    On information and belief, Defendant Walker knew and/or should have known that Mr. Catchings' deteriorating health and physical condition required immediate medical care and attention.

242.    On information and belief, Defendant Walker was aware of and/or participated in internal discussions and communications regarding Mr. Catchings and his deteriorating health and physical condition.

243.    On information and belief, Defendant Walker had access to and/or reviewed Mr. Catchings' jail records, including but not limited to records indicating that he had not been examined by the jail's physicians, taken to the infirmary, and/or received adequate medical care.

244.    Despite the fact that she knew and/or should have known of Mr. Catchings' need for medical care and treatment and had the authority and/or ability to takes measures to remedy the lack of adequate medical care being provided to Mr. Catchings, Defendant Walker failed, with to intervene and thereby, with deliberate indifference, either approved of Mr. Catchings' lack of adequate medical care and/or turned a blind eye to Mr. Catchings' condition and his need for medical care.

*xi.    Allegations Relating to Defendant Steven Drews*

245.    During the period of Mr. Catchings' detention, Defendant Drews was employed by St. Louis County at its Buzz Westfall Justice Center and, on information and belief, held the title of corrections officer.

246.    On information and belief, during the period of Mr. Catchings' detention and including the month of February 2019, Defendant Drews personally observed, interacted with, and/or was aware of Mr. Catchings and his deteriorating health and physical condition.

247.     On information and belief, Defendant Drews knew and/or should have known that Mr. Catchings' deteriorating health and physical condition required immediate medical care and attention.

248.     On information and belief, Defendant Drews was aware of and/or participated in internal discussions and communications regarding Mr. Catchings and his deteriorating health and physical condition.

249.     On information and belief, Defendant Drews had access to and/or reviewed Mr. Catchings' jail records, including but not limited to records discussing his deteriorating health and physical condition and indicating that he had not been examined by the jail's physicians, taken to the infirmary, and/or received adequate medical care.

250.     Despite the fact that he knew and/or should have known of Mr. Catchings' need for medical care and treatment and had the authority and/or ability to takes measures to remedy the lack of adequate medical care being provided to Mr. Catchings, Defendant Drews failed to intervene and thereby, with deliberate indifference, either approved of Mr. Catchings' lack of adequate medical care and/or turned a blind eye to Mr. Catchings' condition and his need for medical care.

*xii.*     *Allegations Relating to Defendant Nathaniel Beard*

251.     During the period of Mr. Catchings' detention, Defendant Beard was employed by St. Louis County at its Buzz Westfall Justice Center and, on information and belief, held the title of corrections officer.

252.     On information and belief, during the period of Mr. Catchings' detention and including the month of February 2019, Defendant Beard personally observed, interacted with, and/or was aware of Mr. Catchings and his deteriorating health and physical condition.

253. On information and belief, Defendant Beard knew and/or should have known that Mr. Catchings' deteriorating health and physical condition needed immediate medical care and attention.

254. On information and belief, Defendant Beard was aware of and/or participated in internal discussions and communications regarding Mr. Catchings and his deteriorating health and physical condition.

255. On information and belief, Defendant Beard had access to Mr. Catchings' jail records, including but not limited to records discussing his deteriorating health and physical condition and indicating that he had not been examined by the jail's physicians, taken to the infirmary, and/or received adequate medical care for his readily apparent deteriorating health and physical condition.

256. Despite the fact that he knew and/or should have known of Mr. Catchings' need for medical care and treatment and had the authority and/or ability to takes measures to remedy the lack of adequate medical care being provided to Mr. Catchings, Defendant Beard failed to intervene and thereby, with deliberate indifference, either approved of Mr. Catchings' lack of adequate medical care and/or turned a blind eye to Mr. Catchings' condition and his need for medical care.

   *xiii.    Allegations Relating to Defendant Roderick Oliver*

257. During the period of Mr. Catchings' detention, Defendant Oliver was employed by St. Louis County at its Buzz Westfall Justice Center and, on information and belief, held the title of corrections officer.

258.    On information and belief, during the period of Mr. Catchings' detention and including the month of February 2019, Defendant Oliver personally observed, interacted with, and/or was aware of Mr. Catchings and his deteriorating health and physical condition.

259.    On information and belief, Defendant Oliver knew and/or should have known that Mr. Catchings' deteriorating health and physical condition required immediate medical care and attention.

260.    On information and belief, Defendant Oliver was aware of and/or participated in internal discussions and communications regarding Mr. Catchings and his deteriorating health and physical condition.

261.    On information and belief, Defendant Oliver had access to and/or reviewed Mr. Catchings' jail records, including but not limited to records discussing his deteriorating health and physical condition and indicating that he had not been examined by the jail's physicians or taken to the infirmary and/or had not received adequate medical care for his readily apparent deteriorating health and physical condition.

262.    Despite the fact that he knew and/or should have known of Mr. Catchings' need for medical care and treatment and had the authority and/or ability to takes measures to remedy the lack of adequate medical care being provided to Mr. Catchings, Defendant Oliver failed to intervene and thereby, with deliberate indifference, either approved of Mr. Catchings' lack of adequate medical care and/or turned a blind eye to Mr. Catchings' condition and his need for medical care.

     *xiv.*    *Allegations Regarding Defendants John and Jane Doe Correctional Officers and Staff*

263.    During the period of Mr. Catchings' detention, certain yet-to-be-identified Defendants John and Jane Doe Correctional Officers and Staff were employed by St. Louis County at its Buzz Westfall Justice Center.

264.    On information and belief, during the period of Mr. Catchings' detention and including the month of February 2019, these Defendants John and Jane Doe Correctional Officers and Staff personally observed, interacted with, and/or were aware of Mr. Catchings and his deteriorating health and physical condition.

265.    On information and belief, these John and Jane Doe Correctional Officers and Staff knew and/or should have known that Mr. Catchings' deteriorating health and physical condition required immediate medical care and attention.

266.    On information and belief, these Defendant John and Jane Doe Correctional Officers and Staff were aware of and/or participated in internal discussions and communications regarding Mr. Catchings and his deteriorating health and physical condition.

267.    On information and belief, these Defendants John and Jane Doe Correctional Officers and Staff had access to and/or reviewed Mr. Catchings' jail records, including but not limited to records discussing his deteriorating health and physical condition and indicating that he had not been examined by the jail's physicians or taken to the infirmary and/or had not received adequate medical care for his readily apparent deteriorating health and physical condition.

268.    Despite the fact that he knew and/or should have known of Mr. Catchings' need for medical care and treatment and had the authority and/or ability to takes measures to remedy the lack of adequate medical care being provided to Mr. Catchings, these Defendants John and Jane Doe Correctional Officers failed to intervene and thereby, with deliberate indifference, either

approved of Mr. Catchings' lack of adequate medical care and/or turned a blind eye to Mr. Catchings' condition and his need for medical care.

***Allegations Relating to Defendants St. Louis County, St. Louis County Department of Justice Services, and St. Louis County Department of Public Health***

    *i.    Knowledge of and Indifference to the Inadequacy of Medical Care at the Buzz Westfall Justice Center*

269.    Prior to, at the time of, and continuing after Mr. Catchings' death, reports of the inadequacy of medical care at the Buzz Westfall Justice Center were matters of public interest, controversy, and discussion.

270.    Prior to, at the time of, and continuing after Mr. Catchings' death, reports of the inadequacy of medical care at the Buzz Westfall Justice Center had been widely reported by the St. Louis media.

271.    Prior to, at the time of, and continuing after Mr. Catchings' death, reports of the inadequacy of medical care at the Buzz Westfall Justice Center had been discussed in open meetings of the St. Louis County Council and/or other open meetings of St. Louis County boards, commissions, and agencies.

272.    On information and belief, prior to, at the time of, and after Mr. Catchings' death, multiple St. Louis County employees, including but not limited to Faisel Khan (both a former and the current Director of Public Health) made internal reports regarding the inadequacy of medical care at the Buzz Westfall Justice Center.

273.    On information and belief, the inadequacy of medical care at the Buzz Westfall Justice Center, including but not limited to the policies of Directors Murphy and Schmidt, .

274.    On information and belief, this dispute led to  Director Khan's resignation for St. Louis County.

275.     On information and belief, prior to the death of Mr. Catchings, St. Louis County officials had conducted other inquiries, reviews, and "root cause analyses" of previous death in the Buzz Westfall Justice Center which indicated that the medical care being provided to detainees was inadequate.

276.     On information and belief, Defendant Murphy was aware of these media reports, discussions by the St. Louis County Council and/or other municipal bodies, internal reports, and/or reviews of previous jail deaths.

277.     Based on these media reports, discussions by the St. Louis County Council and/or other municipal bodies, internal reports, and/or reviews of previous jail deaths, Defendant Murphy knew of the need to take remedial action.

278.     Defendant Murphy failed to take such remedial action, including but not limited to policy revisions and appropriate training, supervision, and/or discipline of her subordinates.

279.     On information and belief, Defendant Schmidt was aware of these media reports, discussions by the St. Louis County Council and/or other municipal bodies, internal reports, and/or reviews of previous jail deaths.

280.     Based on these media reports, discussions by the St. Louis County Council and/or other municipal bodies, internal reports, and/or reviews of previous jail deaths, Defendant Schmidt knew of the need to take remedial action.

281.     Defendant Schmidt failed to take such remedial action, including but not limited to policy revisions and appropriate training, supervision, and/or discipline of her subordinates.

282.     On information and belief, Defendant Doucette was aware of these media reports, discussions by the St. Louis County Council and/or other municipal bodies, internal reports, and/or reviews of previous jail deaths.

283.    Based on these media reports, discussions by the St. Louis County Council and/or other municipal bodies, internal reports, and/or reviews of previous jail deaths, Defendant Doucette knew of the need to take remedial action.

284.    Defendant Doucette failed to take such remedial action, including but not limited to policy revisions and appropriate training, supervision, and/or discipline of her subordinates.

285.    On information and belief, Defendant Physician Doe was aware of these media reports, discussions by the St. Louis County Council and/to other municipal bodies, internal reports, and/or reviews of previous jail deaths.

286.    Based on these media reports, discussions by the St. Louis County Council and/or other municipal bodies, internal reports, and/or reviews of previous jail deaths, Defendant Physician Doe knew of the need to take remedial action.

287.    Defendant Physician Doe failed to take such remedial action, including but not limited to policy revisions and appropriate training, supervision, and/or discipline of her subordinates.

ii.    *Training, Supervision, and/or Disciplining of Nursing Staff*

288.    On information and belief, Justice Services' health care staff and nurses regularly and routinely failed to check and/or record vital signs including but not limited to pulse, blood pressure, respiration, oxygen, and temperature, thereby prohibiting nursing staff and physicians to provide proper oversight and supervision.

289.    On information and belief, Justice Services, its officials, and its final policymaker(s) knew and/or should have known that health care staff and nurses regularly and routinely failed to check and/or record vital signs, including but not limited to pulse, blood pressure, respiration, oxygen, and temperature.

53

290.    On information and belief, Justice Services, its staff, and its officials failed and/or refused to properly train, supervise, and discipline offending staff members for his/her failures to check and/or record vital signs, including but not limited to pulse, blood pressure, respiration, oxygen, and temperature.

291.    On information and belief, Justice Services' health care staff and nurses regularly and routinely failed to follow the standing orders of the authorizing physicians when examining and/or treating detainees.

292.    On information and belief, Justice Services, its officials, and its policymaker(s) knew and/or should have known that health care staff and nurses regularly and routinely failed to follow the standing orders of the authorizing physicians when examining and/or treating detainees.

293.    On information and belief, Justice Services, its staff, and its officials failed and/or refused to properly discipline offending staff members for his/her failure to follow the standing orders of the authorizing physicians when examining and/or treating detainees.

294.    On information and belief, the registered nurses and/or physicians responsible for providing guidance, training, and/or supervision of the practical nurses regularly and routinely failed to provide such guidance, training and/or supervision, including but not limited to failing to review the medical records and patient notes prepared by the practical nurses.

295.    On information and belief, Justice Services, its staff, and its officials knew and/or should have known that the registered nurses and/or physicians responsible for providing guidance and/or supervision of the practical nurses regularly and routinely failed to provide such guidance and/or supervision, including but not limited to failing to review the medical records and patient notes prepared by the practical nurses.

296.   On information and belief, Justice Services, its staff, and its officials failed and/or refused to adequately and properly discipline offending staff members for his/her failures to provide proper guidance and/or supervision of the practical nurse, including but not limited to failing to review the medical records and patient notes prepared by the practical nurses.

   *iii.   Use of Practical Nurses*

297.   On information and belief, it was the policy, practice, and/or custom of Justice Services to regularly and routinely allow and/or utilize practical nurses to perform tasks and services that should have been performed by registered nurses and/or licensed physicians, including but not limited to responding to sick calls in the detainee dormitory areas of the jail, assessing symptoms, making diagnoses, and prescribing treatments.

298.   On information and belief, Justice Services, its officials, and its policymakers knew and/or should have known that it was the policy, practice, and/or custom to regularly and routinely allow and/or utilize practical nurses to perform tasks and services that should have been performed by registered nurses and/or licensed physicians, including but not limited to responding to sick call in the detainee dormitory areas of the jail, assessing symptoms, making diagnoses, and prescribing treatments.

299.   On information and belief, Justice Services, its officials, and its policymakers knew and/or should have known that this policy, practice, and/or custom of regularly and routinely allowing and/or utilizing practical nurses to perform tasks and services that should have been performed by registered nurses resulted in and/or would result in failures to provide adequate and necessary medical care and treatment, including care and treatment of potentially serious conditions and illnesses.

   *iv.   Detainee Counts and "Sign of Life Checks"*

300. On information and belief, Justice Services stated policy was to check on detainee s and their health repeatedly throughout the day, including key tours and multiple "sign of life" checks conducted at multiple scheduled intervals throughout the day and night in which a detainee is forced to stand so that their ability to stand is confirmed.

301. On information and belief, Justice Services' stated policy requiring multiple, effective key tour checks, to observe detainees, was regularly and routinely violated by correctional officers and staff to such pervasive extent as to become the operative practice and custom of the jail.

302. On information and belief, Justice Services' training policies regarding the required key tour checks was inadequate and/or ineffective, to the extent that a significant portion of correctional officers and staff were unaware that such a policy even existed.

303. On information and belief, Justice Services, its officials, and its policymakers, including but not limited to former Director Julia Murphy, knew and/or should have known that correctional officers and staff regularly and routinely failed to perform the required standing "sign of life" checks.

304. On information and belief, Justice Services, its officials, and its policymakers failed to adequately and properly discipline offending staff members for his/her failures to perform effective key tour checks.

305. On information and belief, Justice Services' stated policy requiring multiple, standing, "sign of life" checks was regularly and routinely violated by correctional officers and staff to such pervasive extent as to become the operative practice and custom of the jail.

306.    On information and belief, Justice Services' training policies regarding the required multiple, standing "sign of life" checks was inadequate and/or ineffective, to the extent that a significant portion of correctional officers and staff were unaware that such a policy even existed.

307.    On information and belief, Justice Services, its officials, and its policymakers, including but not limited to former Director Julia Murphy, knew and/or should have known that correctional officers and staff regularly and routinely failed to perform the required multiple, standing "sign of life" checks.

308.    On information and belief, Justice Services, its officials, and its policymakers failed to adequately and properly discipline offending staff members for their failures to perform the multiple, standing "sign of life" checks.

v.    *Scheduling of "Clinic" Visits*

309.    On information and belief, pursuant to Justice Services' policies and practices, correctional officers were prohibited from referring and/or scheduling detainees for "clinic" (i.e., scheduled appointments with registered nurses and/or physicians) even if the need for such medical care and treatment was readily apparent to the correctional officers.

310.    On information and belief, Justice Services, its officials, and its policymakers knew and/or should have known that this policy and/or practice of prohibiting correctional officers from referring and/or scheduling detainee s for "clinic" would result in detainee s not being provided with adequate and necessary medical care and treatments.

**LEGAL CLAIMS**

**Count I – Deprivation of Medical Care Pursuant to the 8th and 14th Amendments, Cognizable Under 42 U.S.C. 1983**

*Against Defendant Dexter Swims, Justin Mohler, Daniel Morgan, Felicia Collins, Bryan Kirkbride, Monika Williams, Justin Anderson, Jordan Atwater, Lakeisha Walker, Nathaniel*

***Beard, Roderick Oliver, Anthony Young, Terrianna Byas, Melissa Susman, and John and Jane Doe Correctional Officers and Staff ("Count I Defendants")***

311.    Plaintiff hereby incorporates by reference the allegations made in each preceding paragraph as if each were set forth herein.

312.    Lamar Catchings had a serious need for medical treatment, care, and attention while detained at Defendant St. Louis County's Buzz Westfall Justice Center.

313.    Defendants Swims, Mohler, Morgan, Collins, Kirkbride, Williams, Anderson, Atwater, Walker, Beard, Oliver, Young, Byas, Susman, and John and Doe Correctional Officers and Staff, while acting under of color of state law and acting alone and in concert with others, knew and/or should have known of Lamar Catchings' serious need for ongoing medical treatment, care, and attention.

314.    Lamar Catchings' medical needs were so obvious and apparent as to be recognizable even to a layperson.

315.    While acting under color of state law, Defendants Swims, Mohler, Morgan, Collins, Kirkbride, Williams, Anderson, Atwater, Walker, Beard, Oliver, Young, Byas, Susman, and John and Doe Correctional Officers and Staff,  acting alone and acting concert with others, failed and/or refused to provide Mr. Catchings with appropriate medical care, treatment, and attention, despite his clear need for such medical care, treatment, and attention.

316.    Defendants Swims, Mohler, Morgan, Collins, Kirkbride, Williams, Anderson, Atwater, Walker, Beard, Oliver, Young, Byas, Susman, and John and Doe Correctional Officers and Staff, acting alone and acting in concert with others, knew and/or should have known that Mr. Catchings was at substantial risk of serious injury to his health, including the possibility of death, from his medical condition but disregarded that risk by intentionally refusing and/or failing to take any reasonable measures to treat his medical conditions and/or address his medical needs.

317.    As the direct and proximate result of the acts and omissions of Defendants Swims, Mohler, Morgan, Collins, Kirkbride, Williams, Anderson, Atwater, Walker, Beard, Oliver, Young, Byas, Susman, and John and Doe Correctional Officers and Staff, while acting alone, in concert with others, and with deliberate indifference to Lamar Catchings' rights and serious medical needs, Mr. Catchings suffered severe and devasting damages and injuries prior to his death, including but not limited to physical pain and suffering and severe anxiety, fear, and mental anguish, as well as suffered a lost chance of survival.

318.    As the direct and proximate result of the acts, omissions of Defendants Swims, Mohler, Morgan, Collins, Kirkbride, Williams, Anderson, Atwater, Walker, Beard, Oliver, Young, Byas, Susman, and John and Doe Correctional Officers and Staff, while acting alone, in concert with others, and with deliberate to Lamar Catchings' rights and serious medical needs, Mr. Catchings was deprived of life-saving treatment and thus suffered the loss of life, loss of future enjoyment of life, and loss of future income.

319.    As the direct and proximate result of the acts and omissions of Defendants Swims, Mohler, Morgan, Collins, Kirkbride, Williams, Anderson, Atwater, Walker, Beard, Oliver, Young, Byas, Susman, and John and Doe Correctional Officers and Staff, while acting alone, in concert with others, and with deliberate indifference to Lamar Catchings' rights and serious medical needs, Tashonda Troupe has been deprived of Mr. Catchings' valuable services, companionship, comfort, consortium, support, love, and affection.

320.    The conduct of Defendants Swims, Mohler, Morgan, Collins, Kirkbride, Williams, Anderson, Atwater, Walker, Beard, Oliver, Young, Byas, Susman, and John and Doe Correctional Officers and Staff, as alleged herein, was wanton, willful, undertaken with evil motives, and/or displayed a deliberate indifference to Lamar Catchings constitutional rights, privileges, and

59

immunities, thereby justifying an award of punitive damages against each individual Defendant, in his or her individual capacity, so as to punish and deter him/her and others from engaging in like misconduct in the future.

321.    As a result of Defendants Swims, Mohler, Morgan, Collins, Kirkbride, Williams, Anderson, Atwater, Walker, Beard, Oliver, Young, Byas, Susman, and John and Doe Correctional Officers and Staff, unlawful actions and infringements of her protected rights, Plaintiff has been compelled to retain counsel in this matter and is therefore entitled to a recovery of attorneys' fees and legal costs pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff Tashonda Troupe respectfully prays that this Honorable Court enter judgement in her favor and against Defendants Swims, Mohler, Morgan, Collins, Kirkbride, Williams, Anderson, Atwater, Walker, Beard, Oliver, Young, Byas, Susman, and John and Doe Correctional Officers and Staff; award her compensatory and punitive damages; award her reasonable costs and attorneys' fees; and grant her any and all such other relief as this Court deems just and proper.

### COUNT II – Unconstitutional Pattern, Practice, and/or Custom

#### *Against Defendants St. Louis County and Julia Murphy*

322.    Plaintiff hereby incorporates by reference the allegations made in each preceding paragraph as if each were set forth herein.

323.    As described herein, the individually-named Defendants and Defendants John and Jane Doe Correctional Officers and Staff, while acting under color of state law and alone and in concert with others, deprived Lamar Catchings of his rights, privileges, and immunities as secured by the Constitution of the United States of America, including but not limited to unlawfully failing

60

to provide him with adequate medical care and attention despite his serious and obvious need for such care and attention.

324.   The misconduct of the individually-named Defendants and Defendants John and Jane Doe Correctional Officers and Staff, as described herein, was authorized by and undertaken pursuant to a practice and custom that what so widespread, well-known, and well-settled, as to constitute a standard operating procedure of Defendants St. Louis County and Julia Murphy, in that it is and was it was the regular pattern, practice and custom to not require detainees to stand for nightly "sign of life" checks.

325.   The serious harms incurred by Lamar Catchings were the direct consequence of this pattern, practice, and/or custom of Defendants St. Louis County and/or Murphy.

326.   As a direct and proximate consequence of the acts of Defendants St. Louis County and Murphy, Mr. Catchings has suffered damages in the form of, *inter alia*, deprivation of his constitutional rights as guaranteed under the Eighth and Fourteenth Amendments, cognizable pursuant to 42 U.S.C. § 1983; physical pain and suffering; severe anxiety, fear, and mental anguish; and loss of life.

327.   As the result of the actions of the individually-named Defendants, Defendants John and Jane Doe Correctional Officers and Staff, Defendant St. Louis County, and Defendant Murphy, Lamar Catchings has suffered in the form of, *inter alia*, deprivation of his constitutional rights as guaranteed under the Eighth and Fourteenth Amendments, cognizable pursuant to 42 U.S.C. § 1983; physical pain and suffering; severe anxiety, fear, and mental anguish; lost a substantial chance of survival, and loss of life.

328.   As a result of Defendants St. Louis County and Murphy's unlawful actions and infringements of his protected rights, Ms. Troupe, on behalf of decedent Lamar Catchings, has

61

been compelled to retain counsel in this matter and is therefore entitled to a recovery of attorneys' fees and legal costs pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff Tashonda Troupe, on behalf of decedent Lamar Catchings, respectfully prays that this Honorable Court enter judgement in her favor and Defendants St. Louis County and Julia Murphy; award her compensatory damages; award her reasonable costs and attorneys' fees; and grant her any and all such other relief as this Court deems just and proper.

**COUNT III – Unconstitutional Policy**

***Against Defendants St. Louis County and Julia Murphy***

329.    Plaintiff hereby incorporates by reference the allegations made in each preceding paragraph as if each were set forth herein.

330.    As described herein, the individually-named Defendants and Defendants John and Jane Doe Correctional Officers and Staff, while acting under color of state law and alone and in concert with others, deprived Lamar Catchings of his rights, privileges, and immunities as secured by the Constitution of the United States of America, including but not limited to unlawfully failing to provide him with adequate medical care and attention despite his serious and obvious need for such care and attention.

331.    The misconduct of the individually-named Defendants and Defendants John and Jane Doe Correctional Officers and Staff, as described herein, was authorized by and undertaken pursuant to a formal policy of Defendants St. Louis County and Julia Murphy, in that it is and was it was the policy of Defendants St. Louis County and Murphy to prohibit and preclude correctional officers and staff from requesting that detainees be scheduled for "clinic" visits in order to be seen by registered nurses and licensed physicians, even when serious medical needs of detainees are so obvious and apparent to necessitate such treatment.

332.    The serious harms incurred by Lamar Catchings were the direct consequence of this pattern, practice, and/or custom of Defendants St. Louis County and/or Murphy.

333.    As a direct and proximate consequence of the acts of Defendants St. Louis County and Murphy, Mr. Catchings has suffered damages in the form of, *inter alia*, deprivation of his constitutional rights as guaranteed under the Eighth and Fourteenth Amendments, cognizable pursuant to 42 U.S.C. § 1983; physical pain and suffering; severe anxiety, fear, and mental anguish; lost a substantial chance of survival, and loss of life.

334.    As the result of the actions of the individually-named Defendants, Defendants John and Jane Doe Correctional Officers and Staff, Defendant St. Louis County, and Defendant Murphy, Lamar Catchings has suffered in the form of, *inter alia*, deprivation of his constitutional rights as guaranteed under the Eighth and Fourteenth Amendments, cognizable pursuant to 42 U.S.C. § 1983; physical pain and suffering; severe anxiety, fear, and mental anguish; and loss of life.

335.    As a result of Defendants St. Louis County and Murphy's unlawful actions and infringements of his protected rights, Ms. Troupe, on behalf of decedent Lamar Catchings, has been compelled to retain counsel in this matter and is therefore entitled to a recovery of attorneys' fees and legal costs pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff Tashonda Troupe, on behalf of decedent Lamar Catchings, respectfully prays that this Honorable Court enter judgement in her favor and Defendants St. Louis County and Julia Murphy; award her compensatory damages; award her reasonable costs and attorneys' fees; and grant her any and all such other relief as this Court deems just and proper.

## COUNT IV – Unconstitutional Pattern, Practice, and/or Custom

### *Against Defendants St. Louis County and Julia Murphy*

63

336.     Plaintiff hereby incorporates by reference the allegations made in each preceding paragraph as if each were set forth herein.

337.     As described herein, the individually-named Defendants and Defendants John and Jane Doe Correctional Officers and Staff, while acting under color of state law and alone and in concert with others, deprived Lamar Catchings of his rights, privileges, and immunities as secured by the Constitution of the United States of America, including but not limited to unlawfully failing to provide him with adequate medical care and attention despite his serious and obvious need for such care and attention.

338.     The misconduct of the individually-named Defendants and Defendants John and Jane Doe Correctional Officers and Staff, as described herein, was authorized by and undertaken pursuant to a practice and custom that what so widespread, well-known, and well-settled, as to constitute a standard operating procedure of Defendants St. Louis County and Julia Murphy, in that it is and was it was the regular pattern, practice and custom to prohibit and preclude correctional officers and staff from requesting that detainees be scheduled for "clinic" visits in order to be seen by registered nurses and licensed physicians, even when serious medical needs of detainees are so obvious and apparent to necessitate such treatment.

339.     The serious harms incurred by Lamar Catchings were the direct consequence of this pattern, practice, and/or custom of Defendants St. Louis County and/or Murphy.

340.     As a direct and proximate consequence of the acts of Defendants St. Louis County and Murphy, Mr. Catchings has suffered damages in the form of, *inter alia*, deprivation of his constitutional rights as guaranteed under the Eighth and Fourteenth Amendments, cognizable pursuant to 42 U.S.C. § 1983; physical pain and suffering; severe anxiety, fear, and mental anguish; and loss of life.

64

341.    As the result of the actions of the individually-named Defendants, Defendants John and Jane Doe Correctional Officers and Staff, Defendant St. Louis County, and Defendant Murphy, Lamar Catchings has suffered in the form of, *inter alia*, deprivation of his constitutional rights as guaranteed under the Eighth and Fourteenth Amendments, cognizable pursuant to 42 U.S.C. § 1983; physical pain and suffering; severe anxiety, fear, and mental anguish; lost a substantial chance of survival, and loss of life.

342.    As a result of Defendants St. Louis County and/or Murphy's unlawful actions and infringements of his protected rights, Ms. Troupe, on behalf of decedent Lamar Catchings, has been compelled to retain counsel in this matter and is therefore entitled to a recovery of attorneys' fees and legal costs pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff Tashonda Troupe, on behalf of decedent Lamar Catchings, respectfully prays that this Honorable Court enter judgement in her favor and Defendants St. Louis County and Julia Murphy; award her compensatory damages; award her reasonable costs and attorneys' fees; and grant her any and all such other relief as this Court deems just and proper.

## COUNT V – Unconstitutional Pattern, Practice, and/or Custom

*Against Defendants St. Louis County, Julia Murphy, Spring Schmidt, and Emily Doucette*

343.    Plaintiff hereby incorporates by reference the allegations made in each preceding paragraph as if each were set forth herein.

344.    As described herein, Defendants Young, Byas, and Susman, while acting under color of state law and alone and in concert with others, deprived Lamar Catchings of his rights, privileges, and immunities as secured by the Constitution of the United States of America, including but not limited to unlawfully failing to provide him with adequate medical care and attention despite his serious and obvious need for such care and attention.

65

345.    The misconduct of Defendants Young, Byas, and Susman, as described herein, was authorized by and undertaken pursuant to a practice and custom that what so widespread, well-known, and well-settled, as to constitute a standard operating procedure of Defendants St. Louis County, Murphy, Schmidt, and/or Doucette, in that it is and was it was the regular pattern, practice and custom to allow unqualified practical nurses to provide medical care and treatment, including but not limited to providing medical assessment, diagnosis, and treatment without the proper guidance and/or supervision of registered nurses and physicians and/or that were to be performed only by registered nurses and licensed physicians.

346.    The serious harms incurred by Lamar Catchings were the direct consequence of this pattern, practice, and/or custom of Defendants St. Louis County, Murphy, Schmidt. and/or Doucette

347.    As a direct and proximate consequence of the acts of Defendants St. Louis County, Murphy, Schmidt, and /or Doucette, Mr. Catchings has suffered damages in the form of, *inter alia*, deprivation of his constitutional rights as guaranteed under the Eighth and Fourteenth Amendments, cognizable pursuant to 42 U.S.C. § 1983; physical pain and suffering; severe anxiety, fear, and mental anguish; lost a substantial chance of survival, and loss of life.

348.    As the result of the actions of Defendants Young, Byas, Susman, St. Louis County, Murphy, Schmidt, and/or Doucette, Lamar Catchings has suffered in the form of, *inter alia*, deprivation of his constitutional rights as guaranteed under the Eighth and Fourteenth Amendments, cognizable pursuant to 42 U.S.C. § 1983; physical pain and suffering; severe anxiety, fear, and mental anguish; lost a substantial chance of survival, and loss of life.

349.    As a result of Defendants St. Louis County, Murphy, Schmidt, and/or Doucette's unlawful actions and infringements of his protected rights, Ms. Troupe, on behalf of decedent

Lamar Catchings, has been compelled to retain counsel in this matter and is therefore entitled to a recovery of attorneys' fees and legal costs pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff Tashonda Troupe, on behalf of decedent Lamar Catchings, respectfully prays that this Honorable Court enter judgement in her favor and Defendants St. Louis County, Julia Murphy, Spring Schmidt, and/or Emily Doucette; award her compensatory damages; award her reasonable costs and attorneys' fees; and grant her any and all such other relief as this Court deems just and proper.

## COUNT VI - Failure to Train, Supervise, and/or Discipline

### *Against Defendants St. Louis County and Julia Murphy*

350. Plaintiff hereby incorporates by reference the allegations made in each preceding paragraph as if each were set forth herein.

351. As described herein, the individually-named Defendants and Defendants John and Jane Doe Correctional Officers and Staff, while acting under color of state law and alone and in concert with others, deprived Lamar Catchings of his rights, privileges, and immunities as secured by the Constitution of the United States of America, including but not limited to unlawfully failing to provide him with adequate medical care and attention despite his serious and obvious need for such care and attention.

352. Defendants St. Louis County and/or Julia Murphy's training program and disciplinary policies regarding jail operations, particularly with respect to obtaining necessary and appropriate medical treatment for detainees and conducting "sign of life," standing counts, and other visual checks were non-existent, inadequate, and/or failed to provide Defendant St. Louis County and Murphy's employees with the necessary knowledge and skills to carry out their duties

67

and/or allowed them to routinely violate the rights of individuals without fear of repercussion or sanction.

353. Defendants St. Louis County and/or Murphy knew and/or should have known that jail employees and staff would routinely be in a position of interacting with persons with serious medical needs and/or in need of necessary and appropriate medical care and treatment.

354. In failing to properly train, supervise, and/or discipline officers and employees regarding these encounters, Defendants St. Louis County and Murphy acted with deliberate indifference to the fact that its failure to provide such training, supervision, and/or discipline would result in detainees failing to receive necessary and appropriate medical care and treatments for serious medical concerns.

355. On information and belief, this indifference to training has resulted in jail detainees failing to receive necessary and appropriate medical care and treatments for serious medical concerns.

356. As a direct and proximate consequence of the acts of Defendants St. Louis County and/or Murphy, Mr. Catchings has suffered damages in the form of, *inter alia*, deprivation of his constitutional rights as guaranteed under the Eighth and Fourteenth Amendments, cognizable pursuant to 42 U.S.C. § 1983; physical pain and suffering; severe anxiety, fear, and mental anguish; lost a substantial chance of survival, and loss of life.

357. As the result of the actions of the individually-named Defendants, Defendants John and Jane Doe Correctional Officers and Staff, Defendant St. Louis County, and/or Defendant Murphy, Lamar Catchings has suffered in the form of, *inter alia*, deprivation of his constitutional rights as guaranteed under the Eighth and Fourteenth Amendments, cognizable pursuant to 42

U.S.C. § 1983; physical pain and suffering; severe anxiety, fear, and mental anguish; lost a substantial chance of survival, and loss of life.

358. As a result of Defendants St. Louis County and/or Murphy's unlawful actions and infringements of his protected rights, Ms. Troupe, on behalf of decedent Lamar Catchings, has been compelled to retain counsel in this matter and is therefore entitled to a recovery of attorneys' fees and legal costs pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff Tashonda Troupe, on behalf of decedent Lamar Catchings, respectfully prays that this Honorable Court enter judgement in her favor and Defendants St. Louis County and Julia Murphy; award her compensatory damages; award her reasonable costs and attorneys' fees; and grant her any and all such other relief as this Court deems just and proper.

### Count VII – Failure to Train, Supervise, and/or Discipline

#### *Against Defendants St. Louis County, Julia Murphy, Spring Schmidt, and Emily Doucette*

359. Plaintiff hereby incorporates by reference the allegations made in each preceding paragraph as if each were set forth herein.

360. As described herein, Defendants Young, Byas, and Susman, while acting under color of state law and alone and in concert with others, deprived Lamar Catchings of his rights, privileges, and immunities as secured by the Constitution of the United States of America, including but not limited to unlawfully failing to provide him with adequate medical care and attention despite his serious and obvious need for such care and attention.

361. Defendants St. Louis County, Murphy, Schmidt and/or Doucette's training program and disciplinary policies regarding jail operations, particularly with to adherence to standing orders and proper review by supervisory staff of the medical notes of practical nurses, was non-existent, inadequate, and/or failed to provide Defendant St. Louis County, Murphy, Schmidt, and/or

Doucette's employees with the necessary knowledge and skills to carry out their duties and/or allowed them to routinely violate the rights of individuals without fear of repercussion or sanction.

362.    Defendants St. Louis County, Murphy, Schmidt, and/or Doucette knew and/or should have known that its jail employees and staff would routinely be in a position of interacting with persons with serious medical needs and/or in need of necessary and appropriate medical care and treatment.

363.    In failing to properly train, supervise and/or discipline its staff and employees regarding these encounters, adherence to standing orders, and need for proper review of medical notes, Defendants St. Louis County, Murphy, Schmidt and/or Doucette acted with deliberate indifference to the fact that their failure to provide such training would result in detainees failing to receive necessary and appropriate medical care and treatments for serious medical concerns.

364.    On information and belief, this indifference to training, supervision, and discipline has resulted in jail detainees failing to receive necessary and appropriate medical care and treatments for serious medical concerns.

365.    As a direct and proximate consequence of the acts of Defendants St. Louis County, Murphy, Schmidt, and/or Doucette Mr. Catchings has suffered damages in the form of, *inter alia*, deprivation of his constitutional rights as guaranteed under the Eighth and Fourteenth Amendments, cognizable pursuant to 42 U.S.C. § 1983; physical pain and suffering; severe anxiety, fear, and mental anguish; lost a substantial chance of survival, and loss of life.

366.    As the result of the actions of Defendants Young, Byas, and Susman, St. Louis County, Murphy, Schmidt and/or Doucette, Lamar Catchings has suffered in the form of, *inter alia*, deprivation of his constitutional rights as guaranteed under the Eighth and Fourteenth

70

Amendments, cognizable pursuant to 42 U.S.C. § 1983; physical pain and suffering; severe anxiety, fear, and mental anguish; lost a substantial chance of survival, and loss of life.

367.    As a result of Defendants St. Louis County, Murphy, Schmidt, and/or Doucette's unlawful actions and infringements of his protected rights, Ms. Troupe, on behalf of decedent Lamar Catchings, has been compelled to retain counsel in this matter and is therefore entitled to a recovery of attorneys' fees and legal costs pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff Tashonda Troupe, on behalf of decedent Lamar Catchings, respectfully prays that this Honorable Court enter judgement in her favor and Defendants St. Louis County, Julia Murphy, Spring Schmidt, and Emily Doucette; award her compensatory damages; award her reasonable costs and attorneys' fees; and grant her any and all such other relief as this Court deems just and proper.

## Count VIII – Wrongful Death

### *Against All Defendants*

368.    Plaintiff hereby incorporates by reference the allegations made in each preceding paragraph as if each were set forth herein.

369.    Defendants owe a duty to ensure the basic welfare of detainees under their protection, including ensuring that detainees receive necessary and adequate medical care.

370.    Defendants breached their duty of care to provide adequate care, including medical care, failing to properly examine, monitor, assess and treat Mr. Catchings.

371.    As a direct and proximate result of Defendants' actions, Mr. Catchings was deprived of life-saving medical care and experienced injuries, was caused to suffer conscious pain and suffering, lost a substantial chance of survival, and loss of life.

372.    As a direct and proximate result of Defendants' actions, Plaintiff was deprived of her son.

373.    Plaintiff is entitled to damages against the Defendants according to § 537.080, MO. REV. STAT., for the wrongful injuries and death of Mr. Catchings, including special damages for his funeral and burial.

374.    Mr. Catchings endured excruciating physical and mental pain, neglect and isolation during the weeks preceding his death, a damage that should be considered and awarded and Defendant's conduct in this case constitutes aggravating circumstances and this conduct was undertaken with knowledge that such conduct produced a high degree of probability of injury to Mr. Catchings and was done with reckless or callous indifference and conscious disregard for the life and safety of others.

WHEREFORE, Plaintiff prays for judgement against Defendants, and each of them jointly and severally, for damages, including prejudgment interest, in a fair and reasonable sum in excess of $75,000.00, their costs incurred herein, punitive damages, and for such other relief as is deemed appropriate by the Court.

### Count IX – Negligence *Per Se* in Violation of § 221.120 MO. REV. STAT.

#### Against All Individually-Named Defendants, Physician Doe, and John and Jane Doe Correctional Officers and Staff

375.    Plaintiff hereby incorporates by reference the allegations made in each preceding paragraph as if each were set forth herein.

376.    Pursuant to § 221.120.1 MO. REV. STAT., "[i]f any prisoner confined to the county jail is sick and in the judgment of the jailer, requires the attention of a physician, dental care, or medicine, the jailer shall procure the necessary medicine, dental care or medical attention necessary and proper to maintain the health of the prisoner."

72

377.    Lamar Catchings was a detainee at the Buzz Westfall Justice Center and under the care, custody, and control of Defendants.

378.    While Lamar Catchings was a detainee at the Buzz Westfall Justice Center, he was in serious need of medical care and attention.

379.    Despite knowledge of the fact that Lamar Catchings was in need of serious medical care and attention, Defendants failed to provide such medical care and attention.

380.    Through their acts and omissions, Defendants violated the requirements of § 211.120 Mo. Rev. Stat., with regard to the rights Lamar Catchings to have access to and receive necessary and proper medical attention.

381.    In enacting § 211.120 Mo. Rev. Stat., the Missouri legislature clearly exercised its legislative will and intent to protect a class of persons, namely jail detainees, by establishing the requirement that they be provided with necessary and proper medical care and attention.

382.    In committing the acts and omissions, as alleged herein, Defendants violated their duties of care, as established in § 211.120 Mo. Rev. Stat.

383.    As the direct and proximate result of Defendants' acts and omissions, as alleged herein, Lamar Catchings suffered devastating personal injuries, physical pain and suffering, emotional distress and mental anguish, lost a substantial chance of survival, and ultimately death.

384.    As the direct and proximate result of Defendants' acts and omissions, as alleged herein, Tashonda Troupe has been deprived of Lamar Catchings valuable services, companionship, comfort, consortium, support, love, and affection.

385.    As the direct and proximate result of Defendants' acts and omissions, as alleged herein, decedent Lamar Catchings suffered loss of life, loss of future enjoyment of life, and loss of future income.

73

386.    The conduct of Defendants, as alleged herein, displayed a complete and utter indifference to and/or conscious disregard for the life and safety of Lamar Catchings and others, such that punitive damages are warranted to deter Defendants and others from like misconduct in the future.

WHEREFORE, Plaintiff Tashonda Troupe respectfully prays that this Honorable Court enter judgement in her favor and against each of the individually-named Defendants; award her compensatory and punitive damages; award her reasonable costs and attorneys' fees; and grant her any and all such other relief as this Court deems just and proper.

### COUNT X – Negligence *Per Se* in violation of Chapter 335, MO. REV. STAT.

*Against Defendants Anthony Young, Terrianna Byas, Melissa Susman, Emily Doucette, and Physician Doe*

387.    Plaintiff hereby incorporates by reference the allegations made in each preceding paragraph as if each were set forth herein.

388.    Pursuant to Missouri's "Nursing Practices Act," Chapter 335, MO. REV. STAT., practical nurses are required, at all times, to be under the "guidance or supervision provided by a person licensed by a state regulatory board to prescribe medications and treatments or a registered professional nurse . . .." § 335.016(14) MO. REV. STAT.

389.    Pursuant to Missouri's "Nursing Practices Act," Chapter 335, MO. REV. STAT., registered professional nurses are allowed, *inter alia*, to "administ[er] . . . medications and treatments as prescribed by a person licensed by a state regulatory board to prescribe medications and treatments." § 335.016(15)(c), MO. REV. STAT.

390.    Lamar Catchings was under the medical care of Defendants Young, Byas, Susman, Doucette, and Physician Doe.

391. Defendants Young and Byas were, at all times relevant hereto, practical nurses and required to practice under the guidance and supervision of a registered nurse and/or licensed physician.

392. On information and belief, Defendant Susman was, at all times relevant hereto, a registered nurse and required to practice under the guidance and supervision of a licensed physician and/or medical doctor.

393. Defendants Doucette and Physician Doe were, at all times relevant hereto, licensed physicians and medical doctors.

394. Defendants Young and/or Byas provided medical care and treatment to Mr. Catchings without the guidance and/or supervision of a registered nurse and/or licensed physician and/or medical doctor.

395. Defendant Susman participated in providing medical care and treatment to Mr. Catchings and/or allowed Defendants Young and Byas to provide medical care and treatment to Mr. Catchings without her guidance and/or supervision and/or the guidance of a licensed physician and/or medical doctor.

396. Defendants Doucette and Physician Doe allowed Defendants Young and Byas to provide medical care and treatment to Mr. Catchings without their guidance and/or supervision.

397. Despite knowledge of the fact that Lamar Catchings was in need of serious medical care and attention, Defendants Young and Byas provided medical care and treatment that exceeded the limitations of their licenses and titles and their lawful ability to do.

398. Through their acts and omissions, Defendants violated the requirements of § 335.016(14), (16) MO. REV. STAT., with regards to the rights Lamar Catchings to have access to and receive necessary and proper medical attention.

399.    In enacting Chapter 335, MO. REV. STAT. ("The Nursing Practices Act"), the Missouri legislature clearly exercised its legislative will and intent to protect a class of persons, namely recipients of medical care and treatment, by establishing the requirement that they be provided with necessary and proper medical care and attention.

400.    In committing the acts and omissions, as alleged herein, Defendants violated their duties of care, as established in § 335.016, MO. REV. STAT.

401.    As the direct and proximate result of Defendants' acts and omissions, as alleged herein, Lamar Catchings suffered devastating personal injuries, physical pain and suffering, emotional distress and mental anguish, lost a substantial chance of survival, and ultimately death.

402.    As the direct and proximate result of Defendants' acts and omissions, as alleged herein, Tashonda Troupe has been deprived of Lamar Catchings valuable services, companionship, comfort, consortium, support, love, and affection.

403.    As the direct and proximate result of Defendants' acts and omissions, as alleged herein, decedent Lamar Catchings suffered loss of life, loss of future enjoyment of life, and loss of future income.

404.    The conduct of Defendants, as alleged herein, displayed a complete and utter indifference to and/or conscious disregard for the health, life, and safety of Lamar Catchings and others, such that punitive damages are warranted to deter Defendants and others from like misconduct in the future.

WHEREFORE, Plaintiff Tashonda Troupe respectfully prays that this Honorable Court enter judgement in her favor and against Defendants Young, Byas, Doucette, and Physician Doe, jointly and severally; award her compensatory and punitive damages; award her reasonable costs and attorneys' fees; and grant her any and all such other relief as this Court deems just and proper.

Dated: April 14, 2021

Respectfully submitted,

PEDROLI LAW, LLC

_____

Mark J. Pedroli, MBE 50787
*PEDROLI LAW, LLC*
7777 Bonhomme Ave, Suite 2100
Clayton, Missouri 63105
314.669.1817
314-789.7400 Fax
Mark@PedroliLaw.com
and

/s/ Daniel Gauthier_
Daniel Gauthier, MBE 37375
130 S. Bemiston Ave, Suite 300
Clayton, Missouri 63105
314.726.1817
314.726.6087 Fax
DJGAttorney@gmail.com
and

/s/ Daniel Kolde__
Daniel J. Kolde, MBE 64965
P.O. Box 440344
St. Louis, Missouri 63105
Tel:    636.675.5383
daniel.kolde.law@gmail.com
**ATTORNEYS FOR PLAINTIFF**