UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TASHONDA TROUPE,                    )
                                    )
       Plaintiff,             )
                                    )
    vs.                          )          Case No. 4:20 CV 1790 RWS
                                    )
ST. LOUIS COUNTY,                   )
et al.,                             )
                                    )
      Defendants.            )

## MEMORANDUM AND ORDER

Lamar Catchings died from an undiagnosed form of leukemia while a
pretrial detainee at St. Louis County's Buzz Westfall Justice Center (Justice
Center).  Plaintiff Tashonda Troupe is Catchings' mother and brings this lawsuit
under 42 U.S.C. § 1983 and state law against St. Louis County and its various
officials, as well as members of the jail and medical staff at the Buzz Westfall
Justice Center for the death of her son.  In addition to St. Louis County, named as
defendants are Emily Doucette (a physician and the acting Director of St. Louis
County Department of Public Health at the time of Catchings' death), Julia
Murphy (the acting Director of the Justice Center at the time of Catchings' death),
Spring Schmidt (the acting Director and/or co-director of St. Louis County's
Department of  Public Health), twelve jail guards (Dexter Swims, Justin Mohler,
Daniel Morgan, Felicia Collins, Bryan Kirkbride, Monika Williams, Justin

Anderson, Jordan Atwater, Lakeisha Walker, Steven Drews, Nathaniel Beard, and Rodrick Oliver), and three nurses (Anthony Young, Terrianna Byas, and Melissa Susman).[1]  Before the Court are motion to dismiss all claims asserted against these defendants in the Second Amended Complaint.  (Docs. 41, 43, 49).  For the reasons stated below, plaintiff's § 1983 claims are dismissed as to all defendants except Young.  The Court will defer ruling on the state law claims pending the parties' decision to appeal the qualified immunity rulings in this Memorandum and Order.

<u>Background Facts</u>

The following facts related are alleged in the Second Amended Complaint and (unless otherwise noted) assumed true for purposes of this motion.

In April of 2018, Catchings was detained at the Buzz Westfall Justice Center awaiting trial on criminal charges.  He was nineteen years old and appeared healthy.  Catchings was a physically and socially active detainee from April of 2018 until January of 2019, when his health began to decline.  During the second week of February, Catchings told a guard that he vomited when he ate and had difficulty hearing.  When the guard suggested Catchings get a sick call request

---

[1] The Second Amended Complaint also names as defendants a physician Doe and John and Jane Doe correctional officers and staff.  Plaintiff pleads that physician Doe was the "Director of Corrections Medicine and/or a licensed physician and medical doctor." (Doc. 29 at 16).  Plaintiff names physician Doe as a defendant only in the state law claims and is not discussed in this Memorandum and Order for that reason.

form from the guard podium, he told her that he could not walk to the podium due to dizziness.  She then took the form to him, which he submitted.  Catchings received no response from medical staff for two days.  As a result, the guard requested medical personnel come to Catchings' cell.

On February 18, 2019, defendant Anthony Young, a licensed practical nurse, visited Catchings in his cell.  The consultation lasted seven minutes.  Despite being informed that Catchings was vomiting when he ate, had hearing loss, had trouble breathing, and was dizzy, Young recorded Catchings only complaint as "headache."  Young did not take or record Catchings' vital signs despite standing orders issued by defendant physician Emily Doucette, the acting Director of St. Louis County's Department of Public Health, to do so.  The standing orders required Young to monitor and record vital signs and contact a medical provider because Catchings reported dizziness coupled with headache.  Instead, Young simply told Catchings to take Tylenol and then informed the corrections officer that he was unconcerned about Catchings' vomiting.

Four days later, on February 22, 2019, Catchings was unable to walk without assistance from guards.  Catchings had a scheduled court appearance that day and told jail staff, including defendant guards Justin Mohler, that he was not feeling well.  Catchings was sick, weak, and vomiting.  Instead of seeking medical treatment for Catchings, defendants Mohler, Justin Anderson, and Lakeisha

Walker carried him from his cell and put him in a wheelchair to take him to court. After returning from court, Catchings continued to report that he felt unwell and requested that he be taken to the infirmary. When a fellow detainee requested Catchings be taken to the infirmary, Walker told the detainee to "shut up and mind his business before he received lockdown time." Catchings was not taken to the infirmary. Instead, he was seen by another licensed practical nurse in his cell, this time defendant Terrianna Byas.

Byas' examination of Catchings lasted only seven minutes. Despite observing his weakness and inability to stand and being informed that Catchings was dizzy and vomited, Byas did not report Catchings' complaint of vomiting and did not follow standing orders which would have required her to contact a medical provider given his combination of symptoms. Instead, she simply told him to complete another sick call form if he did not feel better by morning. Plaintiff alleges upon information and belief that, at the time Byas examined him, she had access to Catchings' medical records, which presumably included Young's report of his examination of Catchings four days prior. Even if I accept this allegation as true, plaintiff alleges that Young only indicated in his report that Catchings complained of a headache. Young's report does not mention Catchings' alleged additional symptoms of hearing loss, dizziness, and/or vomiting, and it does not record any vital signs. As a result, Young's lack of accurate reporting meant that

any alleged access Byas had to Catchings' medical records would not have provided any additional information about Catchings' medical condition that would have assisted Byas in her treatment of Catchings.

At some point after this visit, defendant guard Monika Williams gave Catchings another sick call form, which he completed and returned to her, stating that nothing was going to happen because his previous two requests for help did not result in him being taken to the infirmary or seeing a medical doctor.

Catchings was unable to walk down the stairs to the commissary on February 26, 2019, and again requested to be taken to the infirmary or seen by a medical doctor.  Once again, Catchings was instead visited in his cell by Young. Catchings reported vomiting, heartburn, dizziness, a burning sensation in his chest, and an inability to walk.  Mohler told Young he witnessed Catchings vomit, and Young confirmed this fact by looking in Catchings' trash can.  Young responded by telling Catchings that he was "faking" and that if he did not "stop this behavior," he would "charge" Catchings and have disciplinary sanctions imposed against him.  Young told Mohler that Catchings was a "fucking faker" and that "there is nothing wrong with him."  Mohler requested Young schedule Catchings for a clinic visit, and Young said that he would.  Later that day, defendant Felicia Collins authorized Catchings' move to a cell on a lower level after being told that he was unable to walk down the stairs.  While being moved, Catchings vomited in

front of Mohler and Walker.  Catchings was not taken to the infirmary by Mohler

or Walker.  In fact, Young did not schedule Catchings for a visit to the infirmary or

to see a medical doctor as promised.  Two days later, Catchings was dead.

On February 28, 2019, the day he died, Catchings did not stand for count

during Williams' rounds.  Jail policies require detainees to stand for count in part

to assess physical well-being.  Williams banged on his cell door, but Catchings still

did not stand or respond, so Williams contacted Unit Control.  In response,

defendant guards Dexter Swims, Steven Drews, Nathaniel Beard, "and/or Rodrick

Oliver," came to Catching's cell.[2]  Swims banged on the cell door until Catchings

lifted his head and briefly responded.  Defendants then left without making him

stand or seeking medical attention for Catchings.  Later that day, fellow detainees

heard Catchings say, "I need to see a doctor!"  No one responded to Catchings'

cries for help, although plaintiff does not allege that any jail guards heard him.

Williams tried to roust Catchings later that night, but when he failed to respond she

did not enter the cell to check on him or otherwise call for assistance.  Instead, she

just walked away.  Defendant Bryan Kirkbride "began doing rounds on his shift at

10:15 p.m."  Plaintiff then alleges that defendant Williams (not Kirkbride) failed to

---

[2] Plaintiff's complaint refers to a "defendant Jackson" and a "defendant Ross," but no such
individuals are named as defendants.

make Catchings stand for the 10:15 "sign of life" check in violation of jail policy. Catchings was discovered dead the next morning.

Defendant Melissa Susman was employed at the jail as the nurse supervisor for Young and Byas. After Catchings died, she told the medical examiner that Catchings had been "acting weird" before his death and blamed his death on drugs. However, no drugs were found in Catchings' system during the post-mortem examination. Instead, the medical examiner determined that Catchings died from acute promyelocytic leukemia.[3]   Doucette is alleged to be in charge of the medical staff responsible for Catchings' care.

Plaintiff names two additional jail guards, Daniel Morgan and Jordan Atwater, in her Second Amended Complaint even though no specific factual allegations are asserted against them. Instead, the Second Amended Complaint contains a section entitled "Allegations Relating [to] Mr. Catchings' Deteriorating Health and Physical Condition and Correctional Staff's Knowledge and Notice Thereof," which makes the following identical allegations against each of the named-jail guards:

---

[3] Plaintiff alleges that this form of leukemia is easily diagnosable through a simple blood screening panel and highly treatable. Although plaintiff further alleges that Catchings' symptoms were entirely consistent with -- and indicative of -- a diagnosis of leukemia, it is not alleged (nor does the Court find) that these symptoms were a well-known and obvious indicator of leukemia to a layperson.

On information and belief, during the period of Mr. Catchings' detention and including the month of February 2019, defendant [jail guard] personally observed, interacted with, and/or was aware of Mr. Catchings and his deteriorating health and physical condition;

On information and belief, defendant [jail guard] knew and/or should have known that Mr. Catchings' deteriorating health and physical condition required immediate medical care and attention;

On information and belief, defendant [jail guard] was aware of and/or participated in internal discussions and communications regarding Mr. Catchings and his deteriorating health and physical condition;

On information and belief, defendant [jail guard] had access to and/or reviewed Mr. Catchings' jail records, including but not limited to records discussing his deteriorating health and physical condition and indicating that he had not been examined by the jail's physicians, taken to the infirmary, and/or received adequate medical care; and

Despite the fact that s/he knew and/or should have known of Mr. Catchings' need for medical care and treatment and had the authority and/or ability to take measures to remedy the lack of adequate medical care being provided to Mr. Catchings, defendant [jail guard] failed, with deliberate indifference, to intervene and thereby either approved of Mr. Catchings' lack of adequate medical care and/or turned a blind eye to Mr. Catchings' condition and his need for medical care.

Additional allegations will be discussed below as needed to address the parties' arguments.

## **Discussion**

Defendants move to dismiss the claims asserted against them in the Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  Count I is asserted against all the jail guards and nurses and alleges that they were deliberately indifferent to Catchings' serious medical needs in

8

violation of 42 U.S.C. § 1983.  Counts II through V are asserted against St. Louis County, Murphy, Doucette (Count V only), and Schmidt (Count V only) and allege that they should be liable under § 1983 for allegedly unconstitutional policies, patterns, practices and/or customs.  Counts VI and VII allege that St. Louis County, Murphy, Doucette (Count VII only), and Schmidt (Count VII only) are liable under § 1983 for failing to train, supervise, and/or discipline jail employees and staff.  Count VIII asserts a wrongful death claim against all defendants under Missouri law.  Count IX alleges a negligence per se claim against all defendants except St. Louis County under Mo. Rev. Stat. § 221.120.  Except as to Doucette, plaintiff contends that she has adequately pleaded her claims against defendants and that they are not entitled to dismissal of any claims asserted against them.

Federal Rule of Civil Procedure 8 requires that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," with each allegation being "simple, concise, and direct."  Fed. R. Civ. P. 8(a)(2), (d)(1).  Under Rule 12(b)(6), a party may move to dismiss all or part of a complaint for its failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion a complaint "must include enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A legally sufficient complaint will allow "the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and will state a claim for relief that rises above mere speculation, providing more than just labels and conclusions. *Twombly*, 550 U.S. at 555. Plausibility is not equivalent to probability, but it is something "more than a sheer possibility that a defendant has acted unlawfully." *United States v. Any & All Radio Station Transmission Equip.*, 207 F.3d 458, 462 (8th Cir. 2000). "The question . . . is not whether [a plaintiff] might at some later stage be able to prove [their claims]; the question is whether [a plaintiff] has adequately asserted facts (as contrasted with naked legal conclusions) to support his claims." *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1129 (8th Cir. 2012).

In reviewing plaintiff's Second Amended Complaint, the Court must accept all of plaintiff's factual allegations as true and draw all inferences in her favor. But the Court is not required to accept the legal conclusions plaintiff draws from the facts alleged. *Retro Television Network, Inc. v. Luken Commc'ns, LLC,* 696 F.3d 766, 768-69 (8th Cir. 2012). Additionally, the Court "is not required to divine [plaintiff's] intent and create claims that are not clearly raised, . . . and it need not conjure up unpled allegations to save a complaint." *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009) (en banc) (cleaned up). Where a motion to dismiss is based on an affirmative defense, such as qualified immunity, the moving party must show that it is entitled to the defense on the face of the complaint. *Dadd v. Anoka Cty.*, 827 F.3d 749, 754 (8th Cir. 2016).

Defendants contend that they are qualifiedly immune from plaintiff's § 1983 claims.  As government officials, defendants are entitled to qualified immunity[4] unless: (1) their conduct violated a constitutional right, and (2) that right was clearly established.  *Williams v. Mannis*, 889 F.3d 926, 931 (8th Cir. 2018) (citations omitted).  A right is "clearly established" when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Id.* (alterations in original) (citations omitted). "Although [the United States Supreme] Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.  The inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 2021 WL 4822662, at *2 (U.S. Oct. 18, 2021) (cleaned up).  Qualified immunity is "appropriate where no reasonable fact finder could conclude that the facts when viewed in a light most

---

[4] "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.  The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (cleaned up).  "Because qualified immunity is an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial."  *Id.* (cleaned up).  Accordingly, courts are directed to resolve "at the earliest possible stage in litigation."  *Id.* at 232 (cleaned up).

favorable to the plaintiff show that the officers' conduct violated a clearly established constitutional right." *Williams*, 889 F.3d at 931. (cleaned up).

## A.    Claims Brought Against Defendant Doucette

In her separately filed motion to dismiss (Doc. 41), Doucette moves to dismiss the claims asserted against her for failure to state a claim.  Doucette also alleges she is entitled to qualified immunity on the § 1983 claims.  In response, plaintiff requests the dismissal of the state law claims (Counts VIII, IX, and X) asserted against Doucette  (Doc. #52 at 3) and provides no opposition to Doucette's arguments in support of the dismissal of Count V (§ 1983 claim). (Doc. #52).  Therefore, Counts V, VIII, IX, and X of the Second Amended Complaint are dismissed as to defendant Doucette.  As to Count VII, plaintiff asserts that she has alleged facts sufficient to state a claim against Doucette for failing to train, supervise, and discipline employees under her supervision in violation of § 1983 and that Doucette is not entitled to an assertion of qualified immunity at this stage of the proceedings.

Doucette is not alleged to have personally examined or treated Catchings, and there are no allegations that she knew of Catchings' condition or that Young and Byas did not conduct their examinations of Catchings in accordance with her standing orders.  There are also no allegations that Doucette personally participated in any decision not to transfer him to the infirmary or not to have him examined by

a physician.  There are also no allegations that she made any statements to investigating officials after Catchings' death which indicate any personal knowledge of, or involvement in, his medical care.  Therefore, her liability, if any, stems from her supervisory role of those nurse defendants alleged to have been deliberately indifferent to Catchings' serious medical needs.

As will be discussed below, the Court concludes that Byas and Susman (in addition to the jail guard defendants) did not violate Catchings' constitutional rights and are therefore entitled to qualified immunity.  Because these nurse defendants did not violate Catchings' constitutional rights, there can be no § 1983 liability on the part of Doucette for failing to train and supervise these defendants. *Malone v. Hinman*, 847 F.3d 949, 955-56 (8th Cir. 2017).  Doucette is therefore entitled to dismissal of the sole remaining claim against her unless plaintiff establishes Doucette's supervisory liability as to Young.  As set forth below, plaintiff has not met this burden, so Doucette is entitled to qualified immunity from plaintiff's deliberate indifference claim.

"A supervisor may not be held liable under § 1983 for the constitutional violations of a subordinate on a respondeat superior theory." *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001) (citing *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995)); *see also Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014) ("doctrine of respondeat superior does not apply to § 1983 cases"); *Livers v. Schenck*, 700 F.3d

340, 355 (8th Cir. 2012).  A supervisor may be held liable if the "failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." *Tlamka*, 244 F.3d at 635 (cleaned up).  The plaintiff must show that the supervisor was "deliberately indifferent to or tacitly authorized the offending acts," which requires evidence that "the supervisor had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation." *Id.* (cleaned up).

Here, Doucette asserts that plaintiff's supervisory liability allegations against her fail because she did not participate in Catchings' treatment and was not put on notice of a pattern of constitutional violations.  "When a 'supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts.'" *Davis v. Buchanan Cnty., Mo.*, 11 F.4th 604, 624 (8th Cir. 2021) (cleaned up).

"This 'rigorous standard' requires proof that the 'supervisor had notice of a pattern of conduct **by the subordinate** that violated a clearly established constitutional right.'" *Davis*, 11 F.4th at 624.  (cleaned up).  "Notice is the touchstone of deliberate indifference in the context of § 1983 municipal liability."

14

*Atkinson v. City of Mtn. View, Mo.*, 709 F.3d 1201, 1216 (8th Cir. 2013).

"Allegations of generalized notice are insufficient." *S.M. v. Krigbaum,* 808 F.3d 335, 340 (8th Cir. 2015).  "To impose supervisory liability, other misconduct must be very similar to the conduct giving rise to liability." *Id.* (citation omitted).  In other words, the supervisor must have "notice of a pattern of conduct that was sufficiently egregious in nature." *Id.*  A "single incident, or a series of isolated incidents, is usually insufficient to infer a pattern." *Brewington v. Keener*, 902 F.3d 796, 803 (8th Cir. 2018), *citing Howard v. Adkison*, 887 F.2d 134, 138 (8th Cir. 1989).  Similarly, a "number of individual and isolated incidences of medical malpractice or negligence do not amount to deliberate indifference without some specific threat of harm from a related system wide deficiency . . . ." *Dulany v. Carnahan*, 132 F.3d 1234, 1245 (8th Cir. 1997) (cleaned up).  A supervisor's "mere negligence in failing to detect and prevent a subordinate's conduct is not enough for liability under Section 1983." *Ripson v. Alles*, 21 F.3d 805, 809 (8th Cir. 1994) (cleaned up).

Plaintiff opposes the dismissal of Count VII against Doucette, arguing that she was "well-aware" that her staff routinely violated her standing orders regarding medical practices, which here would have required medical staff to transport Catchings to an infirmary or contact a physician given his combination of symptoms.  Plaintiff also claims that Doucette knew about "deficiencies in the

provision of health care at the Buzz Westfall Justice Center" and that these deficiencies resulted in violations of detainees' constitutional rights.  (Doc. 52 at 5).

As stated above, there are no allegations that Doucette was personally involved in the treatment of Catchings, and plaintiff's barebones allegations fail to meet the "rigorous standard" of proof that Doucette "had notice of a pattern of conduct **by the subordinate** [Young] that violated a clearly established constitutional right.""  *Davis,* 11 F.4th at 624.  Plaintiff's generalized assertions that Doucette knew about unspecified "deficiencies in the provision of health care at the Buzz Westfall Justice Center" do not satisfy this burden, as there are no allegations that Young was even mentioned in any of these reports, or that his failure to follow standing orders with respect to contacting a physician or transferring a patient to the infirmary resulted in the deprivation of any detainee's right to adequate medical care.  As plaintiff's allegations fail to rise to the level necessary to impose § 1983 supervisory liability, Doucette is entitled to qualified immunity on Count VII of the Second Amended Complaint.  As the remaining claims against her have either been dismissed or conceded by plaintiff, Doucette must be dismissed from this lawsuit.

**B.      Deliberate Indifference Claims – Jail Guard Defendants**

Count I is a § 1983 claim and alleges that the jail guard and nurse defendants

in their individual capacities were deliberately indifferent to Catchings' serious

medical needs in violation of his Eighth and Fourteenth Amendment rights.

"Prisoners and pretrial detainees are protected under the Constitution from a

state actor's deliberate indifference towards the inmate's serious medical needs."

*Corwin v. City of Indep., Mo.*, 829 F.3d 695, 698 (8th Cir. 2016) (citing *Estelle v.*

*Gamble*, 429 U.S. 97, 104 (1976); *Davis v. Oregon Cnty.*, 607 F.3d 543, 548 (8th

Cir. 2010)).  "Deliberate indifference to an inmate's serious medical needs violates

the Eighth Amendment's ban against cruel and unusual punishments."  *Krout v.*

*Goemmer*, 583 F.3d 557, 567 (8th Cir. 2009) (citing *Farmer v. Brennan*, 511 U.S.

825, 828 (1994)).  A pretrial detainee's claim of inadequate medical care, on the

other hand, is analyzed under the Due Process Clause of the Fourteenth

Amendment.  *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014); *Krout*,

583 F.3d at 567; *Ervin v. Busby*, 992 F.2d 147, 150 (8th Cir. 1993).  The same

deliberate-indifference standard that governs claims brought by convicted inmates

under the Eighth Amendment also applies to claims brought by pretrial detainees

under the Fourteenth Amendment.  *See, e.g., Jackson*, 756 F.3d at 1065; *Krout*,

583 F.3d at 567; *Ervin*, 992 F.2d at 150.

"Deliberate indifference has both an objective and a subjective component." *Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006).  The objective component requires a plaintiff to demonstrate an objectively serious medical need.  *Grayson v. Ross*, 454 F.3d 802, 808-09 (8th Cir. 2006); *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997).  A serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention."  *Johnson v. Busby*, 953 F.2d 349, 351 (8th Cir. 1991).  "The determination that a medical need is objectively serious is a factual finding."  *Jones v. Minnesota Dept. of Corrections*, 512 F.3d 478, 481–82 (8th Cir. 2008).  "The determination whether a medical need is sufficiently obvious cannot be analyzed in a vacuum. The prison officials' background knowledge is part of the analysis."  *Id.* at 482.

While leukemia is undoubtedly a serious medical condition, as Catchings' leukemia was undiagnosed "the question here, [with respect to the jail guard defendants] is not, in hindsight, whether [Catchings] had a serious medical condition, but rather, whether the condition was so obvious that a layperson would have easily recognized the need for medical treatment.  While some medical conditions that result in death are obvious to a layperson, not all are.  A medical condition is not per se obvious to a layperson because it later results in death." *Jones*, 512 F.3d at 483 (cleaned up) (concluding that inmate who died of

18

undiagnosed pulmonary edema did not have a serious medical condition as a matter of law because symptoms -- which included being unable to stand or walk under her own power, google-eyed, unresponsive, rolling on the ground while grunting and groaning, blood on the mouth, smelling of urine, and rapid breathing -- were not of a "sufficiently obvious medical issue" such that a layperson jail guard would have easily recognized the need for a doctor's immediate attention).

The subjective component requires a plaintiff to show that the defendant actually knew of, but deliberately disregarded, an objectively serious medical need. *Grayson*, 454 F.3d at 808. The level of culpability required to demonstrate deliberate indifference on the part of prison officials is equal to criminal recklessness. *See Jenkins v. Cnty. of Hennepin, Minn.,* 557 F.3d 628, 632 (8th Cir. 2009). For prison officials to be liable for deliberate indifference to a serious medical need, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Holden v. Hirner*, 663 F.3d 336, 343 (8th Cir. 2011) (cleaned up). "Prison officials lacking medical expertise are entitled to rely on the opinions of medical staff regarding inmate diagnosis and the decision of whether to refer the inmate to outside doctors . . . ." *Id.* The determination that prison officials had actual knowledge of a serious medical need may be inferred from circumstantial evidence or from the very fact that the risk was obvious. *See Farmer v. Brennan,*

511 U.S. 825, 842 (1994).  If prison officials have actual knowledge of a serious medical need, and fail to take reasonable measures to address it, they may be held liable for deliberate indifference. *See id.* at 847.  "However, '[a] showing of deliberate indifference is greater than gross negligence and requires more than mere disagreement with treatment decisions."  *Pietrafeso v. Lawrence County, S.D.,* 452 F.3d 978, 983 (8th Cir. 2006), (quoting *Gibson v. Weber,* 433 F.3d 642, 646 (8th Cir. 2006)).

"When evaluating whether an actor deliberately disregarded a risk, we consider 'his actions in light of the information he possessed at the time, the practical limitations of his position and alternative courses of action that would have been apparent to an official in that position.'"  *Letterman v. Does*, 789 F.3d 856, 862–63 (8th Cir. 2015) (quoting *Gregoire v. Class*, 236 F.3d 413, 419 (8th Cir. 2000).  The Court must avoid determining the question "with hindsight's perfect vision," *see Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998), and it must evaluate each defendant's actions separately to determine whether plaintiff has stated a claim for deliberate indifference.  *See Letterman*, 236 F.3d at 862-63.

Count I of the Second Amended Complaint alleges that the jail guard defendants violated Catchings' constitutional rights.  "To prevail on a § 1983 claim, a plaintiff must show each individual defendant's personal involvement in the alleged violation."  *White v. Jackson,* 865 F.3d 1064, 1081 (8th Cir. 2017).

Plaintiff argues that this standard is met with respect to each of the defendants, even though she makes no specific factual allegations about defendants Morgan and Atwater, instead relying on her identical, rote "upon information and belief" allegations made against each named guard.

While "upon information and belief" allegations are still permitted after *Twombly* and may, in some circumstances, be sufficient to state a claim against a defendant, in this case they are not because of the rote, generalized, conclusory nature of the allegations, as well as the fact that these bald conclusions are not supported by any factual allegations.  Morgan and Atwater are not mentioned once in the specific factual allegations of the 77 page Second Amended Complaint. Plaintiff cannot then state a claim against them (or any other defendant) simply by assuming "upon information and belief" that they undertook actions that could subject them to liability in this case.  Plaintiff's belief must be based on factual information that makes the inference of culpability plausible.  *See Iqbal*, 556 U.S. at 682.[5]  That standard is not met here with respect to Morgan, Atwater, or any of the other jail guard defendants, either.  For this reason, the Court disregards the

---

[5] While other courts have concluded that "upon information and belief" allegations are permissible post-*Twombly* if the facts "are peculiarly within the possession and control of the defendant," *see Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010), the Eighth Circuit has not specifically so held.  Even if this standard were applied, however, there is no indication that these allegations -- regarding conversations that took place or medical records which were examined -- would be the type of facts that would qualify for this exception.

formulaic, threadbare "upon information and belief" recitals levelled against Morgan, Atwater, and the remaining jail guard defendants in its consideration of the sufficiency of plaintiff's claims.  *See id.* at 680-81 (bare assertions which are conclusory in nature and not entitled to presumption of truth).  Morgan and Atwater cannot be held vicariously liable for the actions of another prison guard, and the Court concludes that the generalized, rote "upon information and belief" allegations against them are insufficient to state a claim for deliberate indifference against defendants Morgan and Atwater.  In the absence of any specific factual allegations against Morgan and Atwater, plaintiff's § 1983 claim against them is dismissed without prejudice for failure to state a claim.

The same is true of the John and Jane Doe correctional officers and staff defendants.  Although they have not yet been served, the only allegations made against them are the same rote, formulaic allegations as those made against Morgan and Atwater.  For the same reason plaintiff has failed to state a § 1983 claim against Morgan and Atwater, she has also failed to state a § 1983 claim against the John and Jane Doe correctional officers and staff.  Her § 1983 claim against them is dismissed without prejudice for failure to state a claim.[6]

---

[6] In the absence of any factual allegations against them, the Court cannot determine whether these defendants would be entitled to qualified immunity on plaintiff's deliberate indifference claim.

The remaining jail defendants are entitled to qualified immunity because plaintiff has failed to allege sufficient facts demonstrating that any of them were deliberately indifferent to a serious medical need.  In the absence of a constitutional violation, defendants are entitled to qualified immunity.  *See Grayson*, 454 F.3d at 808 ("If the answer [to whether a constitutional right was violated] is no, we grant qualified immunity.").  The specific allegations made as to each jail guard defendant are discussed below.

The only specific factual allegation made against defendant Kirkbride is that on the night Catchings died, he "began doing rounds on his shift."  (Doc. 29 at 37). According to plaintiff's own allegations, Williams – not Kirkbride – failed to make Catchings stand for the 10:15 p.m. "sign of life" check.  (Doc. 29 at 37).  In the absence of any factual allegations demonstrating that Kirkbride knew of, but was deliberately indifferent to, Catchings' medical condition, plaintiff's sole allegation that Kirkbride was "on rounds" the night Catchings died (without any factual allegations that Kirkbride ever saw or interacted with Catchings) is wholly insufficient to permit a reasonable fact finder to conclude that his conduct violated a clearly established constitutional right.  *See Williams*, 889 F.3d at 931.

The only specific factual allegation made against defendant Collins is that she authorized Catchings' move to a lower level on February 26, 2019 after correctional officers reported that he was unable to walk down the stairs.

Catchings had already been examined by Young in his cell earlier that day, and Young had concluded that nothing was wrong with Catchings.  As with the other defendants, the Court concludes that plaintiff's generic, conclusory "upon information and belief" allegations against Collins cannot be considered as evidence that Collins had any "background knowledge" that would have made it obvious that Catchings' inability to walk down the stairs was a serious medical issue which required immediate medical attention.  *See Jones*, 512 F.3d at 482-83. The sole factual allegation against Collins that she authorized Catchings' cell transfer to address his difficulty walking is insufficient to state a claim at this time that Collins knew of, but was deliberately indifferent to, Catchings' serious medical needs.  The facts as alleged do not demonstrate that Collins had actual knowledge of a serious medical need and that she failed to take reasonable measures to address it.  Because no reasonable fact finder could conclude that these facts show that her conduct violated a clearly established constitutional right, Collins is entitled to qualified immunity on plaintiff's deliberate indifference claim.  *See  Williams*, 889 F.3d at 931.

The only specific allegation made against defendant Anderson is that he helped transport Catchings to court on February 22, 2019, in a wheelchair when Catchings was noticeably sick, weak, and vomiting and did not seek immediate medical attention for Catchings.  However, plaintiff does not allege that Catchings

was unable to appear in court as required, and Catchings was seen by medical staff later that day upon his return to the jail.  There are no allegations of further contact between Anderson and Catchings.  Because no reasonable fact finder could conclude that these facts show that Anderson was deliberately indifferent to a serious medical need such that his conduct violated a clearly established constitutional right, he is entitled to qualified immunity on plaintiff's deliberate indifference claim.  *See  Williams*, 889 F.3d at 931.

Plaintiff makes the following specific factual allegations against defendant Walker: she helped transport Catchings to court on February 22, 2019, in a wheelchair when Catchings was sick, weak, and vomiting and did not seek immediate medical attention for Catchings; and, she helped move Catchings to a cell on a lower level at the direction of defendant Collins and did not seek medical attention for Catchings when he had trouble walking and vomited during the cell transfer.  Plaintiff does not allege that Catchings was unable to appear in court as required, and Catchings was seen by medical staff later that day upon his return to the jail.[7]  Walker observed Catchings vomit a second time, during the cell move, and have difficulty walking but did not seek medical treatment for him.  However,

---

[7] Walker's offhand comment to another detainee to mind his own business when he requested that Catchings been seen by the infirmary does not evidence deliberate indifference sufficient to impose liability upon Walker here, especially where Catchings actually received medical care (in the form of a nurse visit to his cell) that day.

he had already been examined by defendant Young earlier that day, who had determined that Catchings was "faking it."

Plaintiff has failed to allege sufficient facts to state a claim against Walker that she knew of Catchings' serious medical need yet deliberately disregarded it. The Eighth Circuit Court of Appeals has acknowledged that vomiting (especially in combination with other symptoms as alleged here) may in some cases indicate a serious medical need.  *See Ivey*, 968 F.3d at 850; *Vaughn v. Gray*, 557 F.3d 904, 909 (8th Cir. 2009) (jail guards who knew that inmate had several diagnosed medical conditions, vomited repeatedly over a seven-hour period, and requested medical treatment not entitled to qualified immunity on claim that they were deliberately indifferent to his serious medical needs when they failed to seek any medical treatment for inmate, who later died).   But in this case Walker saw Catchings vomit on two occasions only – the first time, he was seen by medical staff when he returned from court, and the second time, days later, he vomited just after being seen by Young, who concluded there was nothing wrong with him. Moreover, unlike *Vaughn* this is not a case of denial of medical treatment as, on the first occasion Catchings requested medical care and received it later that day after returning from Court.  There are no allegations that Catchings requested, but was denied, medical care after vomiting during the cell transfer, and as previously mentioned Catchings had been examined in his cell by Young earlier that day prior

to the cell transfer.  Under the facts as alleged, plaintiff has failed to demonstrate that Walker had actual knowledge of a serious medical need of Catchings and failed to take reasonable measures to address it such that she may be liable for deliberate indifference.  Because no reasonable fact finder could conclude that these facts show that her conduct violated a clearly established constitutional right, Walker is entitled to qualified immunity on plaintiff's deliberate indifference claim. *See  Williams*, 889 F.3d at 931.

The only specific factual allegations made against defendants Swims, Drews, Beard, and Oliver is that they came to Catchings' cell in response to a call from Williams about Catchings not standing for count during her rounds. According to the complaint, Swims banged on the cell door until Catchings lifted his head and responded.  Swims, Drews, Beard, and Oliver then left without making Catchings stand or seeking medical help for him.  As with the other defendants, the Court concludes that plaintiff's generic, conclusory "upon information and belief" allegations against these defendants cannot be considered as evidence that they had any "background knowledge" that would have made it obvious that Catchings' failure to stand for count was a serious medical issue which required immediate medical attention. *See Jones*, 512 F.3d at 482-83. There are no allegations that Catchings indicated anything was wrong with him when he responded to Swims, or that he requested but was refused medical

treatment.  The facts as alleged do not demonstrate that Swims, Drews, Beard, and Oliver had actual knowledge of a serious medical need and failed to take reasonable measures to address it such that they may be liable for deliberate indifference.  Because no reasonable fact finder could conclude that these facts show that their conduct violated a clearly established constitutional right, Swims, Drews, Beard, and Oliver are entitled to qualified immunity on plaintiff's deliberate indifference claim.  *See  Williams*, 889 F.3d at 931.

Plaintiff makes the following specific factual allegations against defendant Williams.  She gave Catchings a sick call form, which he completed and returned to her, stating that "nothing was going to happen" because neither of his previous sick call requests had resulted in him being able to visit the infirmary or see a doctor.  Plaintiff does not allege that Williams failed to turn in the sick call form, and in fact Catchings was later seen by medical staff in his cell.  On February 28, 2019, Catchings did not stand for count during Williams' rounds or respond when she banged on the door, so she contacted Unit Control.  Unit Control eventually got Catchings to respond, and after a brief verbal exchange with him they left without making Catchings stand.  Williams did not seek medical attention for him after this exchange.  Catchings again failed to respond to Williams during a later check, but she did not enter the cell to check on him or otherwise call for assistance.  Instead, she just walked away.  Finally, plaintiff alleges that Williams

28

failed to make Catchings stand for the 10:15 p.m. "sign of life" check on the day he died.

As to defendant Mohler, plaintiff alleges that he transported Catchings to court in a wheelchair on February 22, 2019, after Catchings informed him that he was not feeling well and was sick, weak, and vomiting.  Then, on February 26, 2019, Mohler told Young that he witnessed Catchings vomit during Young's visit to Catchings' cell.  After his examination of Catchings, Young told Mohler that Catchings was faking his illness and that there was nothing wrong with him. Despite this, Mohler still requested that Young schedule Catchings for a clinic visit, and Young told him that he would.  After Young's examination of Catchings, Mohler helped move Catchings to a cell on a lower level.  During the move, Catchings had difficulty walking and vomited but Mohler did not schedule Catchings for a visit to the infirmary or to see a doctor.

Williams and Mohler[8] are entitled to qualified immunity on plaintiff's deliberate indifference claims because the facts do not demonstrate that the conduct of these officers violated a clearly established constitutional right. Williams gave Catchings a sick call form in response to his request and turned it in for him, resulting in a visit in his cell by medical staff.  When he did not stand for

---

[8] As with the other jail guards, the Court does not consider the conclusory, rote "upon information and belief" allegations made against Williams and Mohler in its analysis.

count, she contacted Unit Control and officers came to Catchings' cell in response. Catchings responded to those officers, and there are no allegations that he requested medical treatment at that time, or that he later requested medical treatment from Williams.  There are no allegations that Williams had any "background knowledge" that would have made it obvious that Catchings' later failure to respond when she tried to speak to him or stand for count was a serious medical issue which required immediate medical attention.  Although plaintiff alleges that fellow detainees heard Catchings cry out that he needed to see a doctor, there are no allegations that Williams (or any other defendant) heard his request, or that any of the detainees told Williams or any of the other defendants about it. Although Williams' later decision not to take action when Catchings failed to stand for the 10:15 p.m. "sign of life" check was, in hindsight, "no cause for commendation," it does not, under these circumstances, rise to the level of deliberate indifference where there is no evidence that Williams had actual knowledge of a serious medical need of Catchings and failed to take reasonable measures to address it.  *See Jones*, 512 F.3d at 484.  At most, Williams was negligent in not recognizing a serious medical need, which does not rise to the level of deliberate indifference.  *Id.*  "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."  *Id.* (cleaned up).

Williams is entitled to qualified immunity on plaintiff's deliberate indifference claim.

Mohler saw Catchings vomit on three occasions within a four-day period. The first time, Catchings was also noticeably weak and had to be taken to court in a wheelchair. However as previously discussed in connection with Walker, plaintiff does not allege that Catchings was unable to appear in court as required, and Catchings was seen by medical staff when he returned from court. The second time, Mohler solicited medical treatment for Catchings after he witnessed him vomiting in his cell. When Young visited Catchings in his cell, Mohler confirmed Catchings' symptoms to Young and requested that he be scheduled for a clinic visit despite being informed by Young that Catchings was faking his symptoms. Mohler witnessed Catchings have trouble walking and vomit a third time during the cell transfer, just after being seen by Young. Young told Mohler there was nothing wrong with Catchings. At no time did Mohler deny Catchings medical treatment as, on the first occasion Catchings requested medical care and received it later that day after returning from court, and the second time Mohler himself requested care for Catchings after witnessing him vomit. There are no allegations that Catchings requested, but was denied, medical care after vomiting during the cell transfer, and as previously mentioned Catchings had been examined in his cell by Young earlier that day prior to the cell transfer. Mohler was specifically told by

Young at the conclusion of that examination that nothing was wrong with Catchings.

Under these circumstances, plaintiff has failed to demonstrate that Mohler had actual knowledge of a serious medical need of Catchings and failed to take reasonable measures to address it such that he may be liable for deliberate indifference. "Prison officials lacking medical expertise are entitled to rely on the opinions of medical staff regarding inmate diagnosis and the decision of whether to refer the inmate to outside doctors . . . ." *Holden*, 663 F.3d at 343. This reliance must be reasonable. *McRaven v. Sanders*, 577 F.3d 974, 981 (8th Cir. 2009). Such reliance is unreasonable "in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment." *Id.* (cleaned up). That could include circumstances where the prison official knows that the medical professional's diagnosis is based on a faulty assumption. *Id.* (not reasonable for jail guard to rely on medical opinion that detainee did not need to be hospitalized where guard knew the medical professional's opinion was based on the faulty assumption that detainee was under the influence of alcohol, not drugs). Mohler's actions are evaluated in light of "the information he possessed at the time, the practical limitations of his position and alternative courses of action that would have been apparent to an official in that position.'" *Letterman*, 789 F.3d at 862–63.

Here, Mohler knew that Catchings was not feeling well and vomited before his court appearance, that he was seen by medical staff following that appearance, that he vomited a second time several days later and was again seen by medical staff, who assured Mohler nothing was wrong with Catchings.  Mohler then saw Catchings have trouble walking and vomit a third time during his cell transfer. There are no allegations that Mohler knew any facts about Catching that would indicate to Mohler that Young's diagnosis was based on a faulty assumption, nor can it be said that Catchings' medical condition was so obvious that it was evident to a layperson like Mohler that Catchings' medical treatment was inappropriate or inadequate.  Having sought and obtained medical treatment for Catchings and been told by medical staff that nothing was wrong with Catchings, Mohler was at best negligent in failing to recognize a serious medical need, which does not rise to the level of deliberate indifference as a matter of law.  Mohler is entitled to qualified immunity on plaintiff's deliberate indifference claims.  *See Jones*, 512 F.3d at 484.[9]

---

[9] In opposition to dismissal, plaintiff points to *Pool v. Sebastian County, Ark.*, 418 F.3d 934, 944-45 (8th Cir. 2005), to support her argument that Catchings had a serious medical need.  Pool was pregnant, had informed the jail staff she was pregnant, and was experiencing extreme bleeding, clotting, and cramping which eventually led to her miscarriage of a five-month old fetus in the commode of her cell.  The *Jones* Court discussed *Pool* and distinguished it from Jones' situation, concluding that Pool's medical need was serious and obvious to a layperson because the defendants knew that Pool was pregnant, bleeding, and passing blood clots.  *Jones*, 512 F.3d at 482.  The Court finds *Pool* inapposite here because unlike a pregnant, hemorrhaging woman, Catchings' combination of symptoms (many of which were commonplace complaints)

For the foregoing reasons, Count I of plaintiff's Second Amended Complaint is dismissed with respect to the jail guard defendants.

### C.   Deliberate Indifference Claims – Nurse Defendants

Count I also alleges that the nurse defendants were deliberately indifferent to Catchings' serious medical needs.  Young, Byas and Susman contend that they are entitled to qualified immunity on plaintiff's deliberate indifference claims.  Upon due consideration, the Court concludes that Byas and Susman are entitled to qualified immunity but Young is not.

Young examined Catchings twice in his cell during the month of February, 2019.  During the first visit on February 18, 2019, Catchings told Young that he had headaches, dizziness, hearing loss, and vomiting.  Young did not follow standing orders during this seven minute visit, which required him to monitor and record Catchings' vital signs and contact a medical provider because Catchings reported dizziness coupled with headache.  Instead, Young simply told Catchings to take Tylenol and then informed the corrections officer that he was unconcerned about Catchings' vomiting.

After Mohler reported that Catchings was vomiting in his cell, Young visited Catchings for the second time – *eighteen days later*, on February 26, 2019.  Mohler

---

were not so obviously indicative of a serious medical need that a layperson would have easily recognized the need for treatment.

34

indicated to Young that he had witnessed Catchings vomit, and Young confirmed that fact by examining Catchings' trash can. Catchings told Young that he was dizzy, had vomited, had a burning sensation in his chest, and could not walk. Once again, Young failed to follow his standing orders which required him to take and record Catchings' vital signs and to contact a medical provider about his symptoms. Instead, Young simply admonished Catchings to stop his behavior before he "charged" Catchings and had him disciplined. Young then told Mohler that Catchings was a "fucking faker" and that there was nothing wrong with him. When Mohler asked that Catchings be scheduled for a clinic visit anyway, Young agreed but never scheduled Catchings for a clinic or infirmary visit or contacted a medical doctor about Catchings' condition. Two days later, Catchings died.

"Whether a prison's medical staff deliberately disregarded the needs of an inmate is a factually-intensive inquiry." *Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1118 (8th Cir. 2007). "The plaintiff-[detainee] must clear a substantial evidentiary threshold to show that the prison's medical staff deliberately disregarded the [detainee's] needs by administering an inadequate treatment." *Id.* The Court acknowledges that negligent misdiagnosis does not create a cognizable claim under § 1983. *See Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008) ("Medical malpractice alone . . . is not actionable under the Eighth Amendment."). "Although medical negligence does not violate

the eighth amendment . . . medical treatment may so deviate from the applicable standard of care as to evidence a [medical staff's] deliberate indifference." *Moore v. Duffy*, 255 F.3d 543, 545 (8th Cir. 2001).

Here, qualified immunity must be denied at this stage because a reasonable finder of fact could conclude under these alleged circumstances that Young's treatment of Catchings so deviated from the applicable standard of care as to evidence deliberate indifference to a serious medical need.  Although Young's initial failure to diagnose Catchings as requiring medical treatment from a physician might be excused as a "mere failure" to alleviate a significant risk that he should have perceived but did not, the same cannot be said of his second examination.  At that point, Young knew that after eighteen days Catchings was still vomiting, and he was also dizzy, had a burning sensation in his chest, and could not walk.  Instead of following even the most basic examination protocol of taking Catchings' vital signs, Young did nothing except confirm that Catchings actually vomited and then threaten him with discipline if he continued to seek medical attention.  He then tragically and callously misdiagnosed Catchings as a maligner (i.e., a "fucking faker"), telling Mohler there was nothing wrong with him.  Of particular importance in this case is Young's assurance to Mohler that he would schedule Catchings for a clinic visit and his subsequent failure to do so, thereby misleading jail staff and Catchings that an examination by a doctor was

forthcoming, when in fact it was not.  Two days later, Catchings died.  These facts, when combined with Young's background information about Catchings from his previous visit, raise an inference of recklessness precluding qualified immunity. *See McRaven v. Sanders*, 577 F.3d 974, 982–83 (8th Cir. 2009) (qualified immunity denied to prison nurse who misdiagnosed detainee with alcohol poisoning, failed to check vital signs, and then failed to consult test results which would have indicated that something other than alcohol poisoning was wrong). Because plaintiff's allegations would permit a reasonable factfinder to conclude that Young's actions were "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care," *Jackson v. Buckman*, 756 F.3d 1060, 1066 (8th Cir. 2014), qualified immunity must be denied as to Young on plaintiff's deliberate indifference claim.[10]

The same cannot be said of Byas, however.  "An official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.  "A showing of deliberate indifference is greater than gross negligence and requires more than mere disagreement with treatment decisions." *Pietrafeso*, 452 F.3d at 983.  To state a claim for deliberate

---

[10] Young does not contest, and this Court concludes, that Catchings' constitutional right is clearly established here.  *See, e.g., McRaven*, 577 F.3d at 982–83.

indifference and overcome Byas' assertion of immunity, plaintiff must show that Byas actually knew of, but deliberately disregarded, an objectively serious medical need. *Grayson*, 454 F.3d at 808. The level of culpability required to demonstrate deliberate indifference on the part of prison officials is equal to criminal recklessness. *See Jenkins,* 557 F.3d at 632. For prison officials to be liable for deliberate indifference to a serious medical need, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Holden*, 663 F.3d at 343. The question here is whether Byas manifested deliberate indifference to a serious medical need by failing to refer Catchings to a medical doctor.

"When evaluating whether an actor deliberately disregarded a risk, we consider 'his actions in light of the information he possessed at the time, the practical limitations of his position and alternative courses of action that would have been apparent to an official in that position.'" *Letterman*, 789 F.3d at 862–63. The Court must avoid determining the question "with hindsight's perfect vision." *See Jackson*, 140 F.3d at 1152.

On February 22, 2019, Byas examined Catchings in his cell after he was taken to his court appearance in a wheelchair because he was sick, weak, and vomiting. Byas was informed that Catchings was dizzy and vomited, and plaintiff alleges that she was able to observe that he was weak and could not stand. Her

examination lasted seven minutes, and at the conclusion she told Catchings to complete a sick call form if he did not feel better by morning.  Like Young, Byas did not comply with standing orders which required her to contact a medical provider given his combination of symptoms.  Plaintiff makes much of this fact, but a violation of standing orders does not itself give rise to a constitutional violation.  Instead the issue is whether Byas' actions violated Catchings' constitutional rights.  *See Sellers ex rel. Sellers v. Baer*, 28 F.3d 895, 902 (8th Cir. 1994).

The *Jones* case is instructive.  There, the Eighth Circuit concluded that the jail guard and nurse defendants had qualified immunity because no reasonable jury could conclude that the decedent inmate Jones had an objectively serious medical need or that defendants had actual knowledge of a serious medical need.   512 F.3d at 482-83.  Jones died of an undiagnosed pulmonary edema after she became violently sick and was unable to walk on her own power, was google-eyed and unresponsive, with an unpleasant urine-like body odor, a blank stare, heavy, rapid, labored breathing, and was rolling on the ground while grunting and groaning with dried blood and cuts on her lips.  *Id.*  The Eighth Circuit held that Jones' symptoms "were not a sufficiently obvious issue."  *Id.* at 482.  Jones was examined twice by the prison nurse, who noted that her pulse was high at the start of the first examination but did not take a second pulse rate at the end of the examination.

The nurse noted that Jones was uncomfortable, drank two glasses of water, was grunting, and had dried blood on her lips, but nevertheless concluded that she could be admitted to the prison.  *Id.* at 480.

After Jones refused to submit to an unclothed body search, she was searched by officers and examined by the nurse a second time.  *Jones*, 512 F.3d at 480. Jones moaned and grunted throughout the search, complaining of pain.  *Id.*  The second examination of Jones lasted for only 15 seconds, with the nurse telling Jones that "this is what happens when people don't listen to officers."  *Id.*  The nurse asked Jones no medical questions during the second examination.  *Id.*  Later that evening, a correctional officer noted that Jones' eyes appeared strange and that she was moaning in her cell.  *Id.*  The correctional officer then consulted the nurse and asked if she was planning to check in on her during her rounds.  *Id.*  The nurse declined, stating that she had already seen Jones and that "nothing was wrong with her."  *Id.* at 481.  Jones died later that evening and *had never requested medical attention*.  *Id.*

After concluding that Jones did not have an objectively serious medical need and that no reasonable jury could find that any defendant, including the nurse, had actual knowledge of Jones' serious medical need, the Eighth Circuit concluded that the nurse had qualified immunity, even if she had violated applicable duties and regulations with respect to her examinations of Jones.  *Jones*, 512 F.3d at 484.

Plaintiff alleges upon information and belief that, at the time Byas examined him, she had access to Catchings' medical records, which presumably included Young's report of his examination of Catchings four days prior.  Yet plaintiff alleges that Young only indicated in his report of that examination that Catchings complained of a headache and did not report Catchings' alleged additional symptoms of hearing loss, dizziness, and/or vomiting.  As a result, even if plaintiff's "upon information and belief" allegation is accepted as true, Byas' access to Catchings' medical records would not have provided sufficient "background knowledge" such that Byas should have recognized that Catchings' combination of reported symptoms amounted to a serious medical need.

Although plaintiff alleges that the examination "only" lasted seven minutes, the Court cannot infer that such an amount of time is *per se* unreasonable or that Byas exhibited deliberate indifference by conducting an examination that "only" lasted seven minutes.  Unlike the allegations with respect to Young, there are no allegations that Byas failed to take or record Catchings' vital signs, and she only examined him once.  Moreover, there are no allegations that Catchings had recently vomited.  Instead, Byas was informed that Catchings had vomited and was weak prior to being transported to court earlier that day, a circumstance the Eighth Circuit has acknowledged likely "happens commonly in a jail." *Ivey v. Audrain County*, 968 F.3d 845, 850 (8th Cir. 2020).  That the vomiting occurred on the way

to court, a commonly stressful situation for any litigant but particularly for those facing criminal charges, only strengthens the routine nature of Catchings' symptoms.  At the conclusion of the examination, Byas instructed Catchings to seek medical help the following day if his symptoms had not improved.

In the absence of a diagnosis of leukemia, Catchings' combination of reported symptoms, like Jones' symptoms, were "not a sufficiently obvious issue" such that Byas should have easily recognized the need for immediate medical attention.  Although Byas is alleged to have contravened standing orders with respect to her examination of Catchings, there is no allegation that she refused examination or treatment of Catchings.  "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."  *See Vaughn*, 438 F.3d at 852.  Because Byas did not violate Catchings' Fourteenth Amendment rights, she is entitled to qualified immunity.  *See Grayson*, 454 F.3d at 808.

Finally, defendant Susman is not alleged to have personally examined or treated Catchings, and there are no allegations that she actually knew of Catchings' condition or personally participated in any decision not to transfer him to the infirmary or have him examined by a physician.  However, she is alleged to have made statements to investigating officials after Catchings' death which could possibly indicate at least some personal knowledge of his medical care.  She is also alleged to have exercised a supervisory role over Young and Byas.

Although the theory of liability asserted against Susman is less than clear, to the extent she alleges that Susman was deliberately indifferent to Catchings' serious medical needs by telling the coroner that Catchings was "acting weird" and potentially on drugs, the Court concludes that such an allegation does not demonstrate that Susman was deliberately indifferent to a serious medical need. As with the other nurse defendants, in the absence of a diagnosis of leukemia, Catchings' combination of reported symptoms, even if Susman were made aware of them prior to his death, were "not a sufficiently obvious issue"  such that Susman should have easily recognized the need for immediate medical attention. At best, the evidence demonstrates that Susman made a "bad guess" about Catchings' cause of death, which she shared with the coroner.  But "officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *See Vaughn*, 438 F.3d at 852.   In the absence of any evidence that Susman provided medical care to Catchings or that Catchings had a serious medical need, Susman did not violate Catchings' Fourteenth Amendment rights and is entitled to qualified immunity.  *See Grayson*, 454 F.3d at 808.

To the extent plaintiff seeks to impose supervisory liability upon Susman as the supervisor of Young and Byas, "a supervisor may not be held liable under § 1983 for the constitutional violations of a subordinate on a respondeat superior theory." *Tlamka*, 244 F.3d at 635; *Nixon*, 747 F.3d at 543; *Livers*, 700 F.3d at 355.

43

Although a supervisor may be held liable if the "failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." *Tlamka*, 244 F.3d at 635 (cleaned up).  "When a 'supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts.'"  *Davis v. Buchanan Cnty., Mo.*, 11 F.4th 604, 624 (8th Cir. 2021) (cleaned up).

"This 'rigorous standard' requires proof that the 'supervisor had notice of a pattern of conduct **by the subordinate** that violated a clearly established constitutional right.'"  *Davis*, 11 F.4th at 624.  (cleaned up).  "Notice is the touchstone of deliberate indifference in the context of § 1983 municipal liability." *Atkinson v. City of Mtn. View, Mo.*, 709 F.3d 1201, 1216 (8th Cir. 2013). "Allegations of generalized notice are insufficient."  *S.M. v. Krigbaum,* 808 F.3d 335, 340 (8th Cir. 2015).  "To impose supervisory liability, other misconduct must be very similar to the conduct giving rise to liability."  *Id.* (citation omitted).  In other words, the supervisor must have "notice of a pattern of conduct that was sufficiently egregious in nature."  *Id.*  A "single incident, or a series of isolated incidents, is usually insufficient to infer a pattern."  *Brewington v. Keener*, 902

F.3d 796, 803 (8th Cir. 2018), *citing Howard v. Adkison*, 887 F.2d 134, 138 (8th

Cir. 1989).  Similarly, a "number of individual and isolated incidences of medical

malpractice or negligence do not amount to deliberate indifference without some

specific threat of harm from a related system wide deficiency . . . ."  *Dulany v.*

*Carnahan*, 132 F.3d 1234, 1245 (8th Cir. 1997) (cleaned up).  A supervisor's

"mere negligence in failing to detect and prevent a subordinate's conduct is not

enough for liability under Section 1983."  *Ripson v. Alles*, 21 F.3d 805, 809 (8th

Cir. 1994) (cleaned up).

        Here, plaintiff's barebones allegations fail to meet the "rigorous standard" of

proof that Susman "had notice of a pattern of conduct by the subordinate [Young][11]

that violated a clearly established constitutional right."  *Davis,* 11 F.4th at 624.  As

with the allegations against Doucette, generalized allegations that Susman knew

about unspecified "deficiencies in the provision of health care at the Buzz Westfall

Justice Center" do not satisfy this burden, as there are no allegations that Young

was even mentioned in any of these reports, or that his failure to follow standing

orders with respect to contacting a physician or transferring a patient to the

infirmary resulted in the deprivation of any other detainee's right to adequate

medical care.  As plaintiff's allegations fail to rise to the level necessary to impose

---

[11] There can be no supervisory liability in the absence of an underlying constitutional violation
by the nurse defendants.  As only Young is not qualifiedly immune, only Young's actions can
form the basis of supervisory liability.  *See Malone*, 847 F.3d at 955-56.

§ 1983 supervisory liability, Susman is entitled to qualified immunity on Count I of the Second Amended Complaint and is entitled to dismissal of plaintiff's § 1983 claim asserted against her.

### D.    Monell and Supervisory Claims

Count II alleges that St. Louis County and defendant Julia Murphy, as the acting director of the Justice Center at the time of Catchings' death, should be held responsible for unconstitutional patterns, practices, and/or customs that allegedly led to deprivation of Catchings' rights and, ultimately, his death.  Plaintiff alleges there was an unconstitutional pattern, practice, or custom at the Justice Center not to require detainees to stand for nightly "sign of life" checks.  Counts III and IV allege that St. Louis County and Murphy should be held liable for an unconstitutional policy, pattern, practice, and/or custom that prohibits jail guards and staff from requesting that detainees be scheduled for clinic visits, even when the detainees have serious medical needs.  Count V is brought against St. Louis County, Murphy, and Spring Schmidt, as the acting Director and/or co-director of St. Louis Count's Department of Public Health, and alleges that they should be liable for an unconstitutional pattern, practice, and/or custom of allowing unqualified practical nurses to provide medical care and treatment without the proper guidance and/or supervision of registered nurses and physicians.  In Count VI, plaintiff alleges that defendants St. Louis County and Murphy should be held

46

liable for the failure to train, supervise, and/or discipline jail employees for failing to require detainees to stand for nightly "sign of life" checks.  Count VII alleges that St. Louis County, Murphy, and Schmidt should be liable for failures to train, supervise, and/or discipline practical nurses providing care to detainees and to ensure they followed standing orders with respect to physician referrals.

To the extent plaintiff brings claims against Murphy and Schmidt in their official capacities, they are dismissed as a suit against the defendants in their official capacities is actually a suit against defendant St. Louis County itself. *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006) ("A suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent."); *Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 800 (8th Cir. 1998) ("Liability for city officials in their official capacities is another form of action against the city . . . .").

As for the claims brought against Murphy and Schmidt in their individual capacities, as previously stated "[a] supervisor may not be held liable under § 1983 for the constitutional violations of a subordinate on a respondeat superior theory." *Tlamka*, 244 F.3d at 635 (8th Cir. 2001).  Here, plaintiff's barebones allegations fail to meet the "rigorous standard" of proof that Murphy and Schmidt "had notice of a pattern of conduct by [Young] that violated a clearly established constitutional right." *Davis,* 11 F.4th at 624.  Generalized allegations that these defendants knew

47

about unspecified "deficiencies in the provision of health care at the Buzz Westfall Justice Center" do not satisfy this burden, nor do the allegations that they should be liable for failures to train, supervise, and/or discipline practical nurses providing care to detainees and to ensure they followed standing orders with respect to physician referrals.  There are no allegations that any supervisor, including Murphy or Schmidt, had notice of a pattern of misconduct by Young, or that his failure to follow standing orders with respect to contacting a physician or transferring a patient to the infirmary resulted in the deprivation of any other detainee's right to adequate medical care.  As plaintiff's allegations fail to rise to the level necessary to impose § 1983 supervisory liability, Murphy and Schmidt are entitled to qualified immunity and dismissal of plaintiff's § 1983 claims asserted against them.

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that a municipality (or other local government unit) can be liable under 42 U.S.C. § 1983 if an "action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691.  To prevail on a claim alleged against a county, plaintiff must show that the constitutional violation resulted from (1) an official "policy," (2) an unofficial "custom," or (3) a deliberately indifferent failure to train or supervise.  *Corwin v. City of Independence, Mo.*, 829 F.3d 695, 699 (8th Cir. 2016).

"Official policy involves 'a deliberate choice to follow a course of action . . . made from among various alternatives' by an official who has the final authority to establish governmental policy." *Jane Doe A By & Through Jane Doe B v. Special Sch. Dist. of St. Louis Cty.*, 901 F.2d 642, 645 (8th Cir. 1990) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)).

Alternatively, a plaintiff may establish municipal liability through an unofficial custom of the municipality by demonstrating "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, *i.e.*, that the custom was a moving force behind the constitutional violation." *Malone v. Hinman*, 847 F.3d 949, 955 (8th Cir. 2017) (quoting *Corwin*, 829 F.3d at 699-700).

A municipal-liability claim based on a theory of inadequate training or supervision is simply an extension of a claim based on a "policy" or "custom" theory of municipal liability. *Marsh v. Phelps Cty.*, 902 F.3d 745, 751 (8th Cir. 2018). The County may also be held liable if the "failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001) (quoting *Andrews v. Fowler*,

98 F.3d 1069, 1078 (8th Cir. 1996)).  In such a case, the plaintiff must show that the County was "deliberately indifferent to or tacitly authorized the offending acts," which requires evidence that the County "had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation."  *Id.* (quoting *Fowler*, 98 F.3d at 1078).  "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train."  *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quotation omitted).

A plaintiff does not need to specifically plead the existence of an unconstitutional policy or custom.  *See Crumpley-Patterson v. Trinity Lutheran Hosp.*, 388 F.3d 588, 591 (8th Cir. 2004).  However, at a minimum, the complaint must allege facts supporting the proposition that an unconstitutional policy or custom exists.  *Doe ex rel. Doe v. Sch. Dist. of City of Norfolk*, 340 F.3d 605, 614 (8th Cir. 2003).

"This circuit has consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim."  *Johnson v. City of Ferguson*, 926 F.3d 504, 507 (8th Cir. 2019) (en banc).  Only Young's actions can form the basis for municipal liability in this case, as the Court has concluded that the claims against the

remaining defendants are subject to dismissal.  *See Malone*, 847 F.3d at 955-56;

(quotation omitted).

Here, plaintiff has failed to establish a claim for municipal liability against

St. Louis County because there are no well-pleaded facts that any of the County's

alleged customs and/or policies were the moving force behind any constitutional

violation by Young in this case.  Giving plaintiff the benefit of all reasonable

inferences, plaintiff's allegations establish, at most, that Catchings' constitutional

rights were violated because Young failed to follow the County's customs and/or

policies (which required Young to perform basic protocols during examination and

schedule him for a clinic visit with a physician), rather than any "direct causal link

between [these] municipal polic[ies] and custom[s] and the alleged constitutional

deprivation."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).  This is a

rigorous standard of causation.  *Board of County Com'rs of Bryan County, Okla. v.

Brown*, 520 U.S. 397, 405 (1997).  Young's isolated actions cannot form the basis

of municipal liability here.  "That a plaintiff has suffered a deprivation of federal

rights at the hands of a municipal employee will not alone permit an inference of

municipal liability and causation; the plaintiff will simply have shown that the

employee acted culpably."  *Id.* at 406-07.  Plaintiff pleads no facts from which the

Court can infer a direct causal link, resorting instead to mere conclusory

allegations.  As stated above, generalized allegations about unspecified

"deficiencies in the provision of health care at the Buzz Westfall Justice Center" do not satisfy this burden by demonstrating a pattern of unconstitutional conduct so pervasive and widespread as to have the force or law, and there are no allegations of a pattern of misconduct by Young, notice by municipal officials of Young's misconduct, or that Young's failure to follow standing orders with respect to examining a patient or contacting a physician resulted in the deprivation of any other detainee's right to adequate medical care.  As such, plaintiff has failed to state a claim of municipal liability based on any custom or policy.

The same is true of plaintiff's claims for failure to train and supervise against the County.  To state a claim for supervisory liability under § 1983 for a failure to train or supervise against the municipality, plaintiff must plead: (1) notice of a pattern of unconstitutional acts committed by subordinates; (2) deliberate indifference to or tacit authorization of those acts; (3) failure to take sufficient remedial action; and (4) proximate cause of the plaintiff's injury.  *Livers v. Schenck*, 700 F.3d 340, 355 (8th Cir. 2012).  A court analyzes a claim for failure to supervise the same way it analyzes a claim for failure to train.  *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1216 (8th Cir. 2013).

When governmental policymakers are on actual or constructive notice that a particular omission in their training program causes municipal employees to violate constitutional rights, the governmental entity may be deemed deliberately

indifferent if the policymakers choose to retain that program. *Brown*, 520 U.S. at 407. The governmental entity's "policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the governmental entity itself to violate the Constitution." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (cleaned up). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62 (cleaned up).

Here, plaintiff has not pleaded any facts relating to Young's training by the County, or even any facts related to the training program of the County generally. Without facts about the training Young did (or did not) receive, plaintiff fails to sufficiently plead that a failure to train caused the constitutional violation here. Plaintiff simply assumes that Young must not have been trained properly merely because he allegedly committed a constitutional violation. Yet not every failure to provide constitutionally adequate medical care establishes deliberate indifference by the County. *Connick*, 563 U.S. at 62. Plaintiff must plead facts specific to the County's training program, as "[w]ithout notice that a course of training is deficient in a particular respect" the County cannot be held liable for failure to train. *Id.*

53

The same is true of any supervisory liability claim against the County.  As with the other supervisory claims brought by plaintiff, generalized allegations that County officials knew about unspecified "deficiencies in the provision of health care at the Buzz Westfall Justice Center" do not satisfy this burden.  There are no allegations that any supervisor had notice of a pattern of misconduct by Young, or that his failure to follow standing orders with respect to contacting a physician or transferring a patient to the infirmary resulted in the deprivation of any other detainee's right to adequate medical care.  Accordingly, all federal claims asserted against defendants St. Louis County, Murphy, and Schmidt in the Second Amended Complaint are dismissed.

### E.    Supplemental State Law Claims

Defendants also move to dismiss plaintiff's state law claims on various grounds.  To afford the parties the opportunity to determine whether to appeal the qualified immunity rulings in this Memorandum and Order and/or to request a stay of proceedings pending the outcome of any interlocutory appeal, the Court will stay the case for 60 days and deny the motions to dismiss the state law claims without prejudice to being refiled.  If the parties do not request a stay of proceedings pending appeal, then the defendants may refile their motions to dismiss the state law claims at the conclusion of the stay.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiff's motion for extension of time [59] is granted.

**IT IS FURTHER ORDERED** that defendant Emily Doucette's motion to dismiss [41] is granted as follows: Counts V, VIII, IX, and X of the Second Amended Complaint are dismissed without prejudice as to defendant Doucette, and Count VII of the Second Amended Complaint is dismissed with prejudice as to defendant Doucette.

**IT IS FURTHER ORDERED** that the motion to dismiss filed by defendants St. Louis County, Julia Murphy, Spring Schmidt, Dexter Swims, Justin Mohler, Daniel Morgan, Felicia Collins, Bryan Kirkbride, Monika Williams, Justin Anderson, Jordan Atwater, Lakeisha Walker, Steven Drews, Nathaniel Beard, and Rodrick Oliver [43-1] is granted as follows: the federal claims asserted against defendants Morgan, Atwater, and John and Jane Doe correctional officers and staff in Count I of the Second Amended Complaint are dismissed without prejudice; all federal claims asserted against defendants St. Louis County, Julia Murphy, Spring Schmidt, Dexter Swims, Justin Mohler, Felicia Collins, Bryan Kirkbride, Monika Williams, Justin Anderson, Lakeisha Walker, Steven Drews, Nathaniel Beard, and Rodrick Oliver are dismissed with prejudice; the motion to dismiss all state claims asserted against defendants St. Louis County, Julia Murphy, Spring Schmidt, Dexter Swims, Justin Mohler, Felicia Collins, Bryan Kirkbride, Monika Williams,

Justin Anderson, Lakeisha Walker, Steven Drews, Nathaniel Beard, Rodrick Oliver, John and Jane Doe correctional officers and staff, and physician Doe is denied without prejudice to being refiled in accordance with this Memorandum and Order.  Defendants' alternative motions to strike [43-2] and for more definite statement [43-3] are denied as moot.

**IT IS FURTHER ORDERED** that the motion to dismiss filed by defendants Anthony Young, Terrianna Byas, and Melissa Susman [49] is granted as follows: the federal claims asserted against defendants Byas and Susman only are dismissed with prejudice; the motion [49] is denied as to the federal claims asserted against defendant Young; the motion to dismiss the state law claims against defendants Young, Byas, and Susman is denied without prejudice to being refiled in accordance with this Memorandum and Order.

**IT IS FURTHER ORDERED** that this case is stayed for a period of 60 days.


RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 15th day of March, 2022.